[Civ. No. 4219.   Third Appellate District.—December 11, 1930.]

JESSIE B. VANDIVEER, Respondent, v. JAMES W. CHARTERS, Appellant.

348

Errol O. Shour for Appellant.

D. Howard Painter and A. P. Ohanneson for Respondent.

MR. JUSTICE PLUMMER Delivered the Opinion of the Court.—The plaintiff had judgment against the defendants in the sum of $1450 and costs of suit in an action based upon a charge of false imprisonment, $700 of said sum being for the amount of money involuntarily paid by the plaintiff to the defendants, and $750 for and on account of exemplary and actual damages. From this judgment the defendant Charters appeals.

The record shows that on the eleventh day of June, 1926, the plaintiff was, and for some four or five years prior thereto had been an employee, as clerk in the drug-store owned by the defendant James W. Charters. Prior to the eleventh day of June, 1926, the defendant Charters employed the defendants Condon and Johnson to check up on the clerks employed in his drug-store. This work was begun on or about the ninth day of June, 1926, and was conducted for a period of two or three days. On the eleventh day of June, 1926, the defendants Condon and Johnson, in the presence of the defendant Charters, took several dollar bills, money of the United States of America, and marked them with an identification mark. Thereafter, and on the same day, the operatives employed by the defendants Condon and Johnson went into the drug-store referred to and made purchases of merchandise from the plaintiff, paying her for said purchases with money, a part of which consisted of the marked bills. The plaintiff did not ring up on or deposit in the cash register the entire purchase price of the purchases made, as aforesaid, but instead of doing so, placed a part of the purchase price, including the marked bills referred to, in a pocket in an apron worn by the plaintiff.

Shortly thereafter the defendants Condon and Johnson reported the result of their investigation to the defendant Charters, who thereupon informed the plaintiff that Condon and Johnson desired to question her, and immediately the plaintiff and defendants Condon and Johnson went into an adjoining room, known as the stock-room, in the rear of the drug-store. While in said room the defendants Condon and Johnson demanded of the plaintiff that she produce from her person and give to the defendants Condon and Johnson the bills previously marked which she had failed to ring up on the cash register in the drug-store heretofore mentioned. The plaintiff thereupon produced from the pocket in the apron worn by her, four of the marked dollar bills. It appears that the plaintiff and the defendants Condon and Johnson remained in the stock-room for a considerable period of time, the court finding that the interview lasted about three and one-half hours, during which time the defendant Charters was in and out of the room a number of times. The plaintiff was also called out of the room once or twice to answer telephone calls. During the time the plaintiff and the defendants were in the stock-room, as just mentioned, the defendants Condon and Johnson produced, and induced the plaintiff to copy and sign a confession in the following words:

"Los Angeles, Calif., June 11th, 1926.

"During the last four (4) years of my employ by J. W. Charters in his drug store located at 54th Vermont, Los Angeles, Calif., I have taken for my own use money that rightfully belonged to him amounting to Twenty-two Hundred and Fifty ($2250.00) dollars. Some days I took nothing and some days I took as high as $6.00 dollars.

"I make this statement of my own free will and accord without threats or violence or promises of immunity. I promise to lead a straight-forward life in future and my failure to do so will be sufficient grounds to make this statement public.

"JESSIE B. VANDIVEER."

After this writing had been signed the plaintiff, in company with the defendant Condon, went to the home of the plaintiff in an automobile driven by the defendant Condon, a distance of some fifteen or sixteen city blocks from the

drug-store, obtained a pass-book, went to a bank, where the plaintiff withdrew therefrom the sum of $700, obtaining the same in the form of a cashier's check, defendant Condon remaining in the automobile outside the bank while the plaintiff entered the same for the purpose of obtaining the sum of money referred to. The plaintiff returned from the bank with a cashier's check, and being informed by Condon that the $700 was desired in the form of cash, the plaintiff returned to the bank, obtained the cash in lieu of the cashier's certificate, and returned to the automobile where the defendant Condon was waiting, and delivered to him the $700, and accompanied the defendant Condon back to the drug-store where the defendant Condon turned over to the defendant Charters the $700. The plaintiff sued for the return of the money, and for damages in the sum of $12,500 for false imprisonment. The defendant Charters filed a cross-complaint, asking for the sum of $2,250, the sum mentioned in the writing signed by the plaintiff hereinbefore set forth.

Among other things, the court found as follows: That on the eleventh day of June, 1926, at the drug-store to which we have referred, the defendants accused the plaintiff of having committed thefts, all of which accusations were false and without merit, and were made without a prior investigation as to the merits of said accusations; and that the said defendants did, at said time and place, subject the plaintiff to a severe cross-examination commonly termed the "third degree", and that the defendants did, at said time and place threaten to have the plaintiff arrested and placed in prison. That the defendants, by reason of their false accusations and harsh conduct, did forcefully detain plaintiff and grossly humiliate her. That the acts, words and conduct of the defendants, as aforesaid, continued for a period of over three hours; that at the expiration of said period the plaintiff was worn out, tired and fatigued both mentally and physically; that by reason of the acts, words and conduct of the defendants, as aforesaid, while the plaintiff was undergoing said cross-examination commonly termed the "third degree", and while the plaintiff was being forcefully detained and restrained by the defendants, and while the plaintiff was in a fearful and dazed condi-

tion of mind, worn and tired out, etc., she copied and signed the paper to which we have referred.

The court further found, in finding No. V, that the defendants, by means of threats of arrest and by intimidation, restrained, detained and imprisoned plaintiff, and that the defendants did, by the exercise of threats of arrest, and intimidation, compel plaintiff to accompany the defendant Condon to plaintiff's place of residence, and then and there, by means of threats of arrest and intimidation, and by threats of the use of force and violence compel the plaintiff to obtain her deposit book; and likewise, did compel plaintiff to withdraw the $700 from the bank, as hereinbefore stated.

A portion of finding No. V is seriously challenged as being wholly unsupported by the evidence, in that it is claimed the defendant herself did not testify that any threats were made of the use of force or violence relative to compelling her to withdraw the $700 from the bank, and that the plaintiff went into her own home alone to get the pass-book to withdraw the money from the bank, and also went into the bank twice, unaccompanied by any of the defendants, and that during such period of time, there was no restraint and no imprisonment. In this behalf we think the contention of the appellant well taken. While the circumstances as detailed by the plaintiff, if accepted by the trial court as being a correct statement of the occurrences, would constitute a sufficient basis upon which to enter judgment for the return of the money, there does not appear to be any basis for the allegation that during said period of time the plaintiff was either restrained or imprisoned. This, however, does not necessitate a reversal of the judgment, the portion of finding number V challenged by the appellant not being necessary for its support.

A number of witnesses testified in this cause contradicting the plaintiff upon every vital issue, and as the typewritten record before us appears, the claim of the appellant that the judgment should have gone in favor of the defendants would appear to be amply sustained by the weight of the testimony. But the witnesses are not before us, and if the trial court saw fit to accept and believe the testimony of the plaintiff as against the testimony of a number of other

witnesses, if that testimony is sufficient to sustain the judgment, our inquiry as to the sufficiency of the testimony is ended. For this purpose we have only to review the testimony of the plaintiff, as the record indicates the findings and judgment of the trial court are essentially based thereon.

After testifying to her employment in the drug-store for a number of years, and as to seeing the defendants there on the eleventh day of June, 1926, the plaintiff testified substantially as follows: "At about 11 o'clock we had quite a rush of customers, an unusual number of customers for that time in the morning; I was entirely alone in waiting on customers; I waited on these customers, and in waiting on our customers it was usual, if rushed, to lay the money on the register until we could get time to ring it up, that is, if we were alone; so I laid some money, change and bills, on the register that was near the fountain, and there was a place to walk in back of the fountain, either this way (illustrating), or down toward the back of the store; a gentleman came in who wanted to look at a shaving brush; I immediately went back to wait on him, and as I was waiting on him, I noticed a man sitting at the end of the fountain on a stool near the cash register, and I went back and picked up these bills and put them in my little black satin apron pocket; after I had sold the shaving brush, Mr. Charters came into the store and called me back; as we went back into the back room, Mr. Charters introduced me to Mr. Condon, and Mr. Condon said, 'Is there an officer here?' And just then, from behind the prescription case, Mr. Johnson stepped in and said, 'All right.' Mr. Condon said, 'I am representing the Bonding Company.' Mr. Johnson asked me about the money; he asked me to produce it; I handed him my purse; he asked me then for the bills; I told him that I hadn't had time to ring it up. Mr. Johnson said, 'Do you realize that those are marked bills?' I said, 'What do you mean, marked bills?' Johnson said, 'It means you have been stealing from Mr. Charters.' After I had handed Condon my coin purse, Condon said, 'Have you any more money?' He looked over the coin purse very carefully . . . and handed it back, saying, 'This is all right;' I dropped it down in the front

of my dress; then Condon said, 'Have you any more money on your person?' and I said, 'No, sir.' He said, 'Do you want me to search you?' and I said 'No, sir.' 'You know,' said Condon, 'the other day I practically undressed a woman that did not want to be searched.' Condon said it would not do for me to take a couple of bills. Up to this time Condon had not made any remark about money. Mr. Condon said that I had taken things off the shelves at various times and taken them home, and he also asked me how many times I had deliberately opened the register drawers and taken out money; I told him I had never done anything of the kind; Mr. Condon kept telling me that I had been doing these things; then Condon asked me if I had any money in the bank or any property, and I told Mr. Condon that I thought that was my business; Mr. Condon questioned me a great many times, and I wouldn't tell him; he got very angry and walked out of the room; threw a note book that he had in his hand and struck me in the side; walked out of the room and stayed there a few minutes and left me in the room with Mr. Johnson; Mr. Condon came back in and I begged him to bring Mr. Charters so that I could talk with Charters; Condon would go back in the room and come back and say that Charters was busy; Condon kept telling me that I had been doing these things; finally I told Condon and Johnson that I had $700.00 in a savings account that had been given to me Christmas by Mr. Vandiveer, $485.00 of which was my mother's money which she had received at Christmas; they said, 'You have stolen that from Mr. Charters, and you know you have.' I told them I had canceled checks to show for this money. Mr. Condon finally went out and called Mr. Charters in, and they said, 'Well, what do you think about $2500.00?' I went out and answered the telephone once; I told them that I had never taken anything, and that the money I had in the bank was my money. Finally Mr. Charters said, 'Make it $2500.00.' Mr. Condon went outside and then returned and said, 'I will give you just three minutes now to copy and sign this confession, or I am going to take you to jail. Do you want to go to jail?' I said, 'I couldn't think of anything like that; I have no reason to be taken to jail; I have a mother and two

children.' Condon said, 'We don't care anything about your mother and two children. You either copy and sign this, or we are going to take you with us.' They gave me a couple of boxes the same height, and rather than being taken to jail, I copied and signed the confession; I sat on one box and used the other in copying the confession; I thought they were plain-clothes men, and Condon told me if I didn't sign the confession within three minutes, I would be taken." After the writing was signed by the plaintiff, the plaintiff accompanied Mr. Condon to the bank for the cash, as we have heretofore stated.

The plaintiff further testified that she thought Condon and Johnson were plain-clothes men. "Condon told me that he was working for the higher-ups; that he was just a representative of the Bonding Company, and that I must pay this $700 or they were going to take me up; that they were going to take me to .jail; they said this a dozen or more times; they kept repeating that to me, that they were going to take me, and Mr. Condon said he had other places to go, and that if I didn't do it, they were certainly going to take me right away, if I didn't tell them what I had taken and what I had done at different times after accusing me of taking money out of the registers. Every five or ten minutes they would come back and say, 'How many times have you opened the cash register and deliberately taken money out that belonged, rightfully, to Mr. Charters?'" Asked as to whether she had made any request to be permitted to go out of the room, the plaintiff answered, "No, I didn't attempt to go out of the room while I was in there; naturally, when there was an officer of the law, I didn't think I could if I tried, and I was afraid of being taken out, and that is what I was trying to avoid." Neither Condon nor Johnson were, in fact, officers of the law, but the inference could very well be drawn from the testimony of the plaintiff, that language was used by Condon and Johnson to give the plaintiff the impression that one or the other of them was an officer authorized to make arrests. This testimony is all flatly contradicted, but there is no contradiction that the interview lasted approximately three and one-half hours; that during that period of time the plaintiff signed the writing set forth in this opinion,

and thereafter accompanied Condon to the bank, procured the $700 which finally found its way into the possession of the defendant Charters. Upon this testimony and the recital of other incidental facts not necessary to be set forth herein, the court found that the plaintiff signed the confession under duress, paid over the money involuntarily, and was, at least for a portion of the time, restrained of her liberty through threats of being arrested, with the apparent show of force of the two men there ready to take the plaintiff to jail.

On the part of the appellant it is seriously contended that sufficient facts are not shown to warrant a finding of false imprisonment and judgment thereon. Section 236 of the Penal Code reads: ''False imprisonment is the unlawful violation of the personal liberty of another.'' This does not necessarily mean that one shall actually be confined within the walls of a prison. It is a trespass committed by one against the person of another by unlawfully arresting him or detaining him without legal authority, either in prison or in any place temporarily used for the purpose of restraining and detaining such person. Nor is it necessary that there should be any actual physical force used to constitute the imprisonment. In 11 Ruling Case Law, page 793, we find the following: ''In order to constitute false imprisonment it is essential that there should be some direct restraint of the person; but to constitute 'imprisonment', in the sense in which the word is here used, it is not necessary that there should be confinement in a jail or prison. Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment. . . . While actual force is not necessary, it is generally held essential that the conduct of the person complained of must show that force will be used to detain the plaintiff, if necessary, or that the person detaining him does so by some legal authority. The essential thing is the restraint of the person. This may be caused by threats, as well as by actual force; and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force, and the means of coercion are at hand, a

person may be as effectually restrained and deprived of liberty as by prison bars."

It was a question of fact for the trial court to determine whether the words "or conduct", of Condon and Johnson, were such as to induce the plaintiff, as a reasonable person, to apprehend the use of force and coercion, if she declined to act in accordance with their demands. According to the testimony of the plaintiff she was asked to go into the stock-room to be questioned. That she may have gone in there voluntarily does not change the fact that she was immediately confronted with an intimation that an officer was near. Thereafter, during the interview she was accused of stealing and threatened with arrest, and given three minutes' time within which to copy and sign the alleged confession. During that three minutes of time she was effectually restrained and detained, as though she had been behind prison bars. The threat was to take her to jail at the end of three minutes, and the two men were there to take her. This, of course, is based upon giving full credence to the testimony of the plaintiff. To do so was within the province of the trial court.

In 25 C. J., page 454, section XI, ·the rule as to apprehension of force is thus stated: "The restraint constituting false imprisonment may arise out of acts, words, gestures or the like, which induce a reasonable apprehension that force will be used if the plaintiff does not submit, and it is sufficient if they operate upon the will of the person threatened, and result in the reasonable fear of personal difficulties or personal injuries. . . . A voluntary display of force, intended to deprive plaintiff· of his liberty, even without actual laying hands on plaintiff, has been held sufficient, but there is no legal wrong unless the detention was involuntary in the sense of being contrary to the will of the plaintiff." The facts and circumstances set forth in the record are sufficient, if accepted by the trial court as true, to show that the signing of the alleged confession was entirely involuntary, and that the plaintiff copied and signed the instrument involuntarily, and while so doing was acting under the implied threat that at the end of the time specified, if she did not comply with the demands of the defendants, she would be taken to jail.

In the notes to the case of *Whitman* v. *Atchison, T. & S. F. R. Co.,* collected in Ann. Cas. 1912D, pages 722 and 731, we find the following: ''The question of false imprisonment is a mixed question of law and fact. It is a question of law for the court to decide what facts will constitute false imprisonment, and a question of fact for the jury, whether such a state of facts does exist as is necessary to make it an imprisonment under the law as settled by the court.'' (Citing a number of cases.) Thus, in the present case it was necessary for the plaintiff to show that for an appreciable length of time she was detained and restrained of her liberty. This may be done either by threats of the use of force—there being present the means of using such force—or by the actual use of force. It was the province of the trial court to determine if such circumstances existed in the present case. We think the testimony sufficient to warrant the trial court in so finding, if the trial court felt justified in accepting the plaintiff's version of what took place in the stock-room in the rear of the drug-store owned and operated by the defendant Charters.

In the case of *Fleisher* v. *Ensminger,* 140 Md. 604 [118 Atl. 153], referred to in the notes 31 A. L. R. 315, we find a state of facts very similar to those characterizing the instant case, and held sufficient to uphold the finding of false imprisonment. We quote the following: ''It appears that the plaintiff, a saleswoman in the defendant's store, had sold an article and had dropped the money paid therefor, 20 cents, into her apron pocket, intending, so she said, to ring it up on the cash register as soon as she had finished showing goods to a customer who was waiting. Before she did so, however, she was summoned to the defendant's office, whither she was accompanied by another employee, and where, so she alleged, she was charged by the defendant with stealing money and articles, abused, and ordered to bring her pocketbook from the locker-room, which she did while accompanied by an employee at the defendant's direction. She testified also that the defendant told her that he could have her arrested and that she feared such action. The court declared that any deprivation of another's liberty without his consent, by violence, threats, or otherwise, when done unlawfully, constituted false im-

prisonment, and that it could not be said that there was no evidence in this case to go to the jury.'' It was further said: ''The plaintiff's willingness to comply with the defendant's orders would not, it was held, defeat recovery by the former if such willingness was induced by fear of arrest or force.'' To the same effect is the case of *Whitman* v. *Atchison, T. & S. F. R. Co.*, *supra*, also reported in 85 Kan. 150 [34 L. R. A. (N. S.) 1029, 116 Pac. 234]. See, also, *Hebrew* v. *Pulis*, 73 N. J. L. 621 [118 Am. St. Rep. 716, 7 L. R. A. (N. S.) 580, 64 Atl. 121], and the cases there cited.

The amount of damages awarded is not excessive, and under the facts found by the trial court, the plaintiff was entitled to judgment for the return of the $700 paid by her to the defendants, and also entitled to a judgment that the defendant Charters take nothing by reason of his cross-complaint, the testimony of the plaintiff being sufficient to sustain the finding in favor of the plaintiff with regard to these questions.

The judgment is affirmed.