[Civ. No. 15698.  Second Dist., Div. One.  July 22, 1947.]

EUGENE H. WARE et al., Respondents, v. HOWARD F. DUNN et al., Appellants.

Irving M. Smith, City Attorney (Long Beach), Atlee S. Arnold, Frank C. Charvat, Dewey L. Strickler, Deputy City Attorneys, Joseph A. Ball and Clarence S. Hunt for Appellants.

Lee J. Myers for Respondents.

WHITE, J.—Plaintiffs, who are husband and wife, instituted this action by the filing of a complaint titled ''Complaint for Damages for Assault and False Imprisonment.'' Named as defendants are Howard F. Dunn and Charles C. Sullans, police officers of the city of Long Beach, Walter Lentz, as Chief of Police of said city, Orville F. Whittlesey, Inspector of the Vice Squad Detail of the police department of said city, Pacific Fidelity Owners, Ltd., a corporation, and J. A. Crane, as owners of the Schuyler Hotel, and Frank Mee, as night clerk of said hotel. The action is predicated upon the entry by defendant police officers, Dunn and Sullans, into the room in the Schuyler Hotel in which plaintiffs were guests, at a late hour of night, questioning plaintiffs, and requiring identification from them. The damages claimed to have been suffered resulted from shock, humiliation and embarrassment allegedly suffered by plaintiffs. Punitive damages also were prayed for. No claim is advanced that any physical force or violence was used upon the person of either plaintiff.

At the conclusion of plaintiffs' case, on their motion, the action was dismissed as to defendant Chief of Police Walter Lentz. As to defendants Crane, Mee and Pacific Fidelity Owners, Ltd., their motion for a nonsuit was granted. A similar motion on behalf of defendants Dunn, Sullans and Whittlesey was denied.

The jury returned a general verdict in favor of plaintiffs as against the defendants Dunn and Sullans, fixing damages in the sum of $1,000. The jury found for the defendant Whittlesey.

Defendants Dunn and Sullans moved for a new trial, which motion was granted ''on the grounds of excessive damages and the insufficiency of the evidences to justify the verdict,'' provided, however, that should plaintiffs file an election to remit $500 of such judgment within a stated time, then said motion for a new trial would be denied. Plaintiffs, within the prescribed time, filed such election of remission.

From the judgment as entered and from the order denying their motions for judgment notwithstanding the verdict, defendants Dunn and Sullans prosecute this appeal.

Appellants earnestly urge that the evidence is insufficient to justify the verdict and that the verdict is against law. These contentions make it necessary to epitomize the testimony given at the trial. Because it is the rule that all intendments are in favor of the verdict arrived at on conflicting

evidence, and our province is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict rendered, and which is not inherently improbable, we shall narrate the testimony in a light most favorable to respondents. We shall not attempt to analyze the evidence of witnesses who testified in behalf of appellants. That was the province of the triers of fact. Should we conclude that there is sufficient evidence to support the findings of the jury and the judgment of the court, it would be an idle task to review evidence in conflict therewith. Authorized though we are to consider the evidence, we are without authority to weigh it.

With the foregoing rules in mind, we deem the following a fair summary of the factual background which gave rise to this litigation:

The Schuyler Hotel is a commercial hotel located in the downtown business district of Long Beach, in Los Angeles County. The appellants were members of the Long Beach Police Department, assigned to work in plain clothes out of the "Vice Squad Bureau," under the direction of defendant Inspector Whittlesey. Their duties consisted in part of policing the downtown hotels for the detection and suppression of morals offenses.

On the afternoon of June 17, 1943, plaintiff Mrs. Viola Alice Ware went to the Schuyler hotel and requested a room for herself and her husband. She was advised that the hotel did not register couples unless they were together; that she could register in her name and when her husband arrived he would be required to register also. Mrs. Ware stated that her husband was in the Navy and was expected to arrive in port that evening. An arrangement was made with the clerk whereby Mrs. Ware would be charged at the rate of single occupancy of the room, with fifty cents added thereto for the nights her husband would occupy the room with her.

Mrs. Ware then registered on a white individual registration card as "Mrs. E. H. Ware, 460 Ellis St., San Francisco," and was assigned to room 408. From this card the clerk made out a "blue house card," which was placed in a rack in the clerk's quarters for reference in the usual course of business to ascertain the occupants of a particular room. The card signed by the guest was filed away.

Plaintiff Mr. Ware did arrive at the hotel on the afternoon of June 17 about 4:30 p. m. A different room clerk was on duty, and Mr. Ware registered by adding to the white regis-

tration card previously signed by his wife the words "Mr. &" in front of Mrs. Ware's signature. This addition made upon the white registration card was not appended to the "blue house card" above referred to. Both plaintiffs then went to the room, which they occupied on the nights of June 17 and June 18.

On the night of June 19, plaintiffs returned to the hotel between 11 and 11:30 p. m., went to their room, and within 30 to 45 minutes retired. Plaintiff Mr. Ware testified that before retiring he locked the door to the room. As to what occurred thereafter is thus described by him in his testimony:

"Q. Now, did anything unusual happen that night after you had retired?

"A. We'd been in bed approximately half an hour when I heard someone at the door, coming in; there was enough light in the room, there, I could see the door was open, and someone was stepping in. I called, 'Who is it?' A man said, 'Police officers.' About that time a light was switched on, and I asked him what he wanted. Mr. Dunn was the first one in the door; he said, 'I want to see your ID card.' So I was still in bed, on the side of the bed nearest the door, and he walked over to me with a badge in his hand, and showed it to me. At that time I was entirely undressed, here, alongside of the bed; I had my shorts there. I put them on before I got out of bed, threw back the covers. I got up; my clothes were hanging in the clothes closet, blues, my wallet was inside there. My ID card was in it; I got the ID card out, showed it to Mr. Dunn, and about that time he called me into the bathroom.

"Q. Let me just interrupt you, Mr. Ware. Was there any knock at the door before these officers entered? A. I heard none.

"Q. And how many came into the room? A. Three.

"Q. And were they in the room before you got out of bed? A. They were.

"Q. All three of them? A. All three."

With reference to what transpired between plaintiff Mr. Ware and defendant Officer Dunn in the bathroom, Mr. Ware testified as follows:

"Q. What did he say to you with reference to the registration? . . . A. He said we were not registered properly.

"Q. . . . What did you say? A. I said we were.

"Q. And what happened? A. We all exchanged words there for a few minutes; he claimed we were not registered

properly, and I said we were. We didn't seem to get any place at that.

"Q. You had some argument about that? A. Well, it was just back and forth, no real heated argument."

According to plaintiff Mr. Ware, there was further conversation with defendant Officer Dunn, wherein the latter explained that the police department was "working in conjunction with the military authorities, endeavoring to keep down the venereal rate in the area where there were so many service men," and that plaintiff Mr. Ware, being a service man, "probably understood what it was all about." This witness also testified that there were no threats uttered, no talk of arrest, no violence, and that he went into the bathroom voluntarily in response to Officer Dunn's request, "Will you come into the bathroom, I want to speak to you." Plaintiff Mr. Ware also testified that just prior to defendant Officer Dunn's exit from the room he said to the officer, "All right, I know what you are up against in this type of situation."

As to the reasons which prompted defendant officers Dunn and Sullans to go to plaintiffs' room in the Schuyler Hotel, the record reflects that defendant Inspector O. F. Whittlesey, who was in charge of the vice squad of the Long Beach Police Department, received an anonymous call over the telephone between 11 and 11:30 p. m., advising him that the police should "investigate room 408 in the Schuyler Hotel." The Police Inspector then detailed the aforesaid officers to investigate the complaint. Appellant Dunn had been a member of the police department some nine years, with six years' experience on the vice squad, while Officer Sullans had several years' experience as a police officer. Upon arrival at the hotel, both appellants proceeded directly to the hallway outside room 408. Listening, they could distinguish the voices of a man and a woman in the room, but could not understand what either was saying. They then went to the clerk's desk on the ground floor, where they asked defendant Frank Mee, the night clerk, if they could see the registration card for room 408. Thereupon the clerk "searched his files and was unable to find it, so he took out a blue card that he said was the accountant's card, the one they kept their finances on, and I (officer Dunn) noticed that it was registered to a Mrs. Ware." According to Officer Dunn's testimony, the following colloquy took place between himself and the night clerk:

"I said, 'Is this room registered to one person?' and he said,

'Yes, according to the card,' and I said, 'Are you sure that this is registered to just one person?' and he said, 'Yes, as far as the card,' he said, 'I don't know, I didn't see the people, but according to that card it is registered to one woman.'"

Thereupon the appellant officers returned to the plaintiffs' room for the purpose, as testified to by them, of investigating the possibility of a violation of two sections of the Long Beach Penal Code, viz., sections 242 and 246 (Ord. No. C-1697), both of which sections declare that any person violating the provisions thereof shall be guilty of a misdemeanor.

For the reasons heretofore stated, we shall not narrate the testimony of appellant officers as to the method by which they obtained admission to the room and as to what transpired thereafter. Suffice it to say that such testimony is in many respects directly in conflict with plaintiffs' evidence and was to the effect that the door to the room was unlocked, that the officers, knocked, announced they were police officers, and were, in effect, invited into the room by plaintiff Mr. Ware.

As a first ground of appeal it is earnestly asserted that the conduct of appellants did not violate any of the asserted rights of respondents. With this we cannot agree. The right of the people to be secure in their homes against unreasonable searches and seizures is guaranteed by both the federal and state Constitutions (Const. U.S., 4th Amendment; Cal. Const., art. I, § 19). The inviolability of this guarantee cannot be impaired or destroyed under the guise or pretext of "making an investigation" by those clothed with official authority.

It is appellants' contention that they neither committed an assault nor falsely imprisoned plaintiffs. True, no physical violence was used upon plaintiffs nor was any bodily harm suffered by them. But the "violent injury" contemplated by section 240 of the Penal Code is not synonymous with "bodily harm," and, as was said in *People* v. *Bradbury,* 151 Cal. 675, 676 [91 P. 497], "includes any wrongful act committed by means of physical force against the person of another, even although only the feelings of such person are injured by the act."

The primary question to be decided is whether the conduct and actions of appellants, as described by respondents, whose version thereof was believed by the jury, were unlawful. Appellant police officers had no warrant, did not witness the commission of a misdemeanor, and admittedly did

not suspect the commission of a felony. The question of the "reasonableness" of the officers' conduct is not controlling in the instant case. That doctrine applies only in cases involving a felony and its application stems from section 836 of the Penal Code, which authorizes an officer to make an arrest when a person has committed a felony, though not in the presence of the officer; where a felony has been committed and the officer has reasonable cause for believing the person arrested to have committed it; on a charge made, upon a reasonable cause, of the commission of a felony; or at night, when there is reasonable cause to believe that the person has committed a felony.

In misdemeanor cases an officer is authorized to make an arrest only when such public offense is committed or attempted in his presence (Pen. Code, § 836, subd. 1). So zealous is the law for the liberty of the individual that unless the misdemeanor is committed in his presence an officer may not make an arrest upon a warrant at nighttime "unless upon the direction of the magistrate, indorsed upon the warrant" (Pen. Code, § 840). All of the cases cited by appellants wherein the question of "reasonable grounds" or "probable cause" for the conduct and actions of peace officers were considered, involved felonies. We are not cited to a single case involving a misdemeanor wherein the conduct of an officer in making an arrest or detaining a person was considered in the light of "reasonable grounds" or "probable cause" for causing such detention. And our search for such a case has been equally fruitless.

False imprisonment is defined by section 236 of the Penal Code as "the unlawful violation of the personal liberty of another." To unlawfully violate the personal liberty of another does not mean that such person must be placed or confined in a prison. All that is necessary to make out a charge of false imprisonment is that the individual be restrained of his liberty without any sufficient complaint or authority therefor, and it may be accomplished by words or acts which such individual fears to disregard. Temporary detention is sufficient, and the use of actual physical force is not necessary. The essential thing in false imprisonment is the restraint of the person (*Vandiveer* v. *Charters,* 110 Cal. App. 347, 355 [294 P. 440]). According to plaintiffs' testimony, which we must accept, the words and conduct of the officers may well be held to be of such a character as to induce

a reasonable apprehension or fear on the part of the former of the use of force should they resist the entry into their room and the conduct of the officers therein. Certainly, the means of coercion were at hand. Under such circumstances, the restraint is as effectual as if the deprivation of liberty had been accomplished by lodging plaintiffs behind prison bars. As was said in *McAlmond* v. *Trippel,* 93 Cal.App. 584, 588 [269 P. 937], "Any detention under pretended color of official right is imprisonment. Even a detention of a person outside of a public institution, against his will and without right, amounts to false imprisonment."

In *McAlmond* v. *Trippel, supra,* at page 589, it is further stated (quoting from *Webber* v. *Doust,* 84 Wash. 330 [146 P. 623]) : "If an officer abuses his authority, he is a trespasser *ab initio,* and liable for false imprisonment. 1 Cooley on Torts (3d ed.), p. 314. . . ." In the case with which we are here concerned the only justification for the officers to invade the sanctity and privacy of plaintiffs' room, which was then their home, was the right to make an arrest. As heretofore pointed out, appellant officers were without such authority. Their entry under pretended color of official right was therefore an abuse of the authority invested in them as peace officers, and relegated them to the category of trespassers. ". . . the mere belief or suspicion that a misdemeanor is being, or has been, committed is insufficient to warrant an arrest without a warrant; nor may an arrest without a warrant be made on a belief, founded on information received from a third person, that a misdemeanor is being committed." (6 C.J.S. 594, 595.) An officer cannot justify an arrest on his "reasonable belief" that the person arrested was then committing a misdemeanor (*Adair* v. *Williams,* 24 Ariz. 422 [210 P. 853, 26 A.L.R. 278, 282]). Nor is it sufficient that the officer believed that the person apprehended was engaged in the commission of a misdemeanor, though such belief may have been entertained in the utmost good faith (*State* v. *Bradshaw,* 53 Mont. 96 [161 P. 710]; *State* v. *Small,* 184 Iowa 882, 884 [169 N.W. 116]; *McGuire* v. *State,* 19 Ala.App. 138 [95 So. 565]). The cases just cited are based on statutes similar to ours on the right of a peace officer to make an arrest without a warrant.

Appellants place great reliance on the fact that the officers were misled by the hotel clerk, who informed them that the room in question was registered only to Mrs. Wade. But from what we have herein stated it is manifest that were such the

fact, nevertheless, the officers, under the circumstances here present, would not have been authorized to invade it, however strong might have been their "belief" or unquestioned their "good faith" in the "belief" that a misdemeanor was being committed therein.

From time immemorial the most conspicuous feature of history has been the struggle between liberty and authority. Today, as in ages past, we are not without tragic proof that the exacted power of some governments to ignore the inalienable right of the individual to liberty and to resort to lawless enforcement of the law is the handmaid of tyranny. No higher duty, no more solemn responsibility, rests upon the courts than to maintain the constitutional and statutory shields planned and inscribed to preserve liberty under law and protect each individual from oppression and wrong, from whatever source it may emanate.

The judgment appealed from, and the order denying the motion of defendants Dunn and Sullans for judgment notwithstanding the verdict, are, and each is, affirmed.

York, P. J., and Doran, J., concurred.