[Civ. No. 17288.   Second Dist., Div. One.   Apr. 17, 1950.]

ZELLA M. PARROTT, Respondent, v. BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSOCIATION et al., Appellants.

Hugo A. Steinmeyer, George L. Beckwith and McLaughlin & Hutchinson for Appellants.

Schell & Delamer and Frederick W. Bahl for Respondent.

WHITE, P. J.—Plaintiff sued defendants for damages for false arrest, imprisonment, malicious and oppressive conduct, wrongful discharge, and slander. At the commencement of trial, the court sustained the objection of defendants to all evidence as to the second cause of action for slander in that it did not state facts sufficient to constitute a cause of action and overruled a similar objection to the first cause of action.

During the course of the trial, defendants' motions to strike all evidence as to any acts occurring on or after August 15, 1946, were denied as was defendants' motion for nonsuit. Objection by plaintiff to defendants' offer in evidence of the complaint filed by plaintiff against Grace M. Sturdevant (who had falsely accused plaintiff of having received the deposit in question) was sustained.

Defendants' motion for a directed verdict was denied and the case went to the jury who found for the plaintiff in the sum of $30,000. Defendants' motion for a judgment notwithstanding the verdict was denied and judgment was rendered on the verdict. Defendants' motion for a new trial was denied. They now bring this appeal from the judgment.

The events and circumstances upon which the alleged cause of action is based are as follows:

In August, 1943, plaintiff commenced working for defend-

ant bank at its Palm Springs branch. In May, 1946, she took a month's vacation and upon her return, she was transferred to the Los Angeles Sixth and Alexandria branch. In July, 1946, she was transferred to the Los Angeles Shatto-Wilshire branch. During the major portion of these three years, plaintiff served as a teller and for a short time was engaged in training tellers.

On August 12 or 13, 1946, Mrs. Grace M. Sturdevant, described by one of appellants as "a well-established customer" of long standing, reported to Mr. Vogelsang, the Shatto-Wilshire branch manager, that on August 2d she had made a deposit of about $500 consisting of $280.30 in cash and the remainder in the form of five checks, with a new teller at the branch; that she did not have her passbook at the time and was not certain whether she had received a duplicate deposit slip, but in any case, she could not find it; that on August 9th she returned to the bank with her passbook and requested the same teller to make the entry of August 2d and the teller informed her that she could find no record of the deposit. Mr. Vogelsang recalled that plaintiff was the only new teller and he pointed her out to Mrs. Sturdevant, asked if that was the teller that waited on her, and Mrs. Sturdevant said "yes."

Mr. Vogelsang conducted a preliminary search to trace the deposit to no avail. He then reported the matter to Mr. Leif, chief of the Southern California Inspection Department of the bank. Mr. Leif in turn assigned the matter to Inspector Sigler in his department.

On August 15th Mr. Sigler conferred with Mr. Vogelsang and the chief clerk of the Shatto-Wilshire branch and reviewed all of the transactions occurring on August 2d. He talked to Mrs. Sturdevant at her home the same morning and to the manager of the Sturdevant apartment house, the deposit being made up of tenant rent payments. He checked the personnel record of plaintiff by telephone, which revealed a number of shortages at the Palm Springs branch and that plaintiff had taken an extended vacation trip. He obtained a report by telephone from the Seventh and Broadway branch, where plaintiff maintained a savings account, that there was a balance in plaintiff's account of approximately $300 and that there had been no withdrawals of any size for some time. Mr. Sigler then told the chief clerk to summon plaintiff to the desk of Mr. Kennedy, the assistant manager. Mr. Kennedy's desk was 5' x 3½' and was not in a private office but was separated from the lobby of the bank by a railing. When

plaintiff approached the desk, about 3 p. m. in response to the request of Mr. Kennedy, Mr. Sigler was introduced to her as an inspector and investigator for the bank. Plaintiff was then seated between Mr. Kennedy and Mr. Sigler at the desk; during the latter part of the interview Mr. Vogelsang sat in on the conversation and Mr. Kennedy went to another part of the bank.

Mr. Sigler started the conversation by stating that the deposit was missing, that he believed it had been made. Plaintiff denied any knowledge of it. During the course of the interview, Mr. Sigler pointed out to plaintiff her record of shortages at the Palm Springs branch and he said that he concluded from that record, from the nonactivity of her savings account and from her refusal of salary advances that plaintiff's shortages at Palm Springs financed her vacation. Plaintiff stated that she had withdrawn $253 from her savings account for the vacation and that upon her return rather than ask for any salary advance, she had borrowed a small sum from a friend. (Plaintiff's bankbook introduced in evidence during trial showed the withdrawal of $253.)

Sigler said that he believed she had taken the deposit cash and had destroyed the checks inasmuch as they had not cleared. He told plaintiff that it would look very bad for her, that the only assumption he could arrive at was that she was guilty and that the best thing for her to do would be to admit it and agree to make restitution. Otherwise, the matter would be turned over to the FBI and the bank would prosecute, that it would be in the papers, her folks would find out about it, it would be very expensive and embarrassing, and it would be her word against Mrs. Sturdevant and the Bank of America. Plaintiff denied taking the deposit money throughout this interview and she stated to Mr. Sigler that she did not understand why she should sign a confession and make restitution of the $280.30 when she did not take it. Mr. Sigler told plaintiff if she signed a confession and made restitution, the bank would probably drop the matter and not do anything further.

By this time plaintiff was nervous, frightened, and crying. She agreed to sign a confession. Mr. Sigler then phoned Mr. Leif that plaintiff said she would sign a confession. Mr. Leif instructed Mr. Sigler to tell plaintiff that the bank could not guarantee her immunity and then to bring her to the downtown office for the purpose of obtaining her signed statement. Mr. Sigler told plaintiff the bank would not guarantee her immunity if she confessed and asked her to go down to the

main office to sign a confession. Plaintiff said she would rather think about it overnight and go the next day, but Mr. Sigler said that the chief inspector was waiting for her downtown and was expecting her to come that evening. Plaintiff went to the downtown office because, as she testified during the trial, she was frightened and feared arrest that evening or soon thereafter by the FBI and she thought it would be easier to sign a confession and pay the $280.30 than to face arrest and prosecution. It was then 4:30 or 5 p.m.

As plaintiff left the bank with Mr. Sigler, she felt faint and stumbled and Mr. Sigler took hold of her arm and they got into his car. They drove to the home of Mr. Leif's secretary and plaintiff asked permission to use the phone. She called her fiancé, told him of the accusation, that she did not take the money, but that if she did not sign a confession, the FBI would be informed and she would be prosecuted. After her phone conversation plaintiff told Mr. Sigler she would not sign a confession, but Mr. Sigler said she had better come to the downtown office anyway and talk about it to Mr. Leif, who was expecting them.

Plaintiff, Mr. Sigler, and the secretary arrived at Mr. Leif's office about 5:15 or 5:30 p.m. Mr. Sigler told Mr. Leif that plaintiff had in the meantime made a phone call and that she had changed her mind about signing a confession. Mr. Leif stated that perhaps her friend had given her some bad advice and perhaps she should see an attorney. Mr. Leif told plaintiff that he would have to report the missing deposit to the national banking authorities and to the FBI and that if plaintiff repaid the money, the bank would inform the FBI that the bank would not mind if the matter were dropped, but if the money were not repaid, the bank would let the law take its natural course, and that if plaintiff had taken the money, it would be far better for her to sign a confession and make restitution. Plaintiff refused. Mr. Leif told her she was suspended as an employee until the case was settled. This interview lasted until 6:30 or 6:45 p.m.

On August 16th, Mr. Leif talked to plaintiff again and asked if she had changed her mind and if she would authorize a withdrawal on her savings account. Plaintiff refused.

On August 24th a friend of plaintiff talked to Mr. Vogelsang and asked the status of plaintiff's position with the bank. Mr. Vogelsang said plaintiff was no longer an employee, that the bank considered her unsatisfactory.

On September 25th, the bank debited plaintiff's savings

account with the $280.30. (The hold on plaintiff's savings account was alleged in the complaint to have been made on August 16th and this was admitted in the answer, but the date of September 25th was in evidence during the trial.) On the same day the bank wrote to the agent in charge of the United States Bureau of Investigation in Los Angeles, and to E. M. Wright, National Bank Examiner, as follows:

''This is to inform you of a shortage in the account of Zella M. Parrott, former teller at our Shatto-Wilshire Branch, which appears to be a defalcation, in the amount of $280.30.

''Miss Parrott admitted accepting a deposit containing a number of checks and $280.30 in cash from a customer of the branch without passing credit to the account. She agreed in the presence of two of our officers to tell the whole story and offered to make restitution. Subsequently, she denied ever having accepted the deposit, but evidence on file indicates that possibly she used the cash and misplaced or destroyed the checks.''

On October 1st, Mrs. Sturdevant came into the bank and talked to Mr. Vogelsang. She was very much upset—she had been mistaken, she had found the deposit. Mr. Vogelsang phoned this information to Mr. Leif and in compliance with instructions, credited plaintiff's savings account with $280.30. Mr. Leif phoned plaintiff and told her he would like to see her the following morning at the bank—he did not tell her the reason for his wishing to see her. Plaintiff came to Mr. Leif's office the following day with her attorney. Mr. Leif told plaintiff that the deposit had been found, that Mrs. Sturdevant had misplaced it, that no harm had been done, that it was just a mistake that anybody could make, and that her account had been recredited with the $280.30. Plaintiff asked if she still had her job, and he replied, ''No.''

On October 2d, the bank wrote again to the U. S. Bureau of Investigation and to the National Bank Examiner, as follows:

''We wrote you on September 25 regarding a shortage in the accounts of Zella M. Parrott, former teller at our Shatto-Wilshire Branch.

''The depositor who claimed to have made the deposit that resulted in the apparent shortage now informs us that the deposit was not made and there is, therefore, no apparent shortage as indicated in our letter.''

Under date of November 13th, a prospective employer of plaintiff wrote to the bank asking the reason for plaintiff's

discharge as an employee. Under date of November 20th, the bank replied:

". . . Fairly satisfactory.

"Not adapted to teller work—lacks accuracy. Would possibly be better suited to a type of clerical work other than we had to offer her in the bank."

As to the ill effects suffered by plaintiff as a result of the false accusation, evidence during the trial revealed that prior to August 15th she had been in good health. On the evening of August 15th she was crying and hysterical and thereafter had a nervous breakdown. On August 19th she placed herself under a doctor's care necessitating visits to the doctor twice a week for the first year and once a week for the next year. During that time she continued to be frightened and nervous. She cried a great deal and could not sleep without having nightmares. She avoided her friends. She could not maintain a proper diet, her reflexes were exaggerated, she had fainting spells and severe headaches. She lost 17 pounds in weight. Chest X-rays revealed a bronchial condition necessitating rest in bed. She was unable to obtain permanent employment and from August 15, 1946, to the date of trial, March 8, 1949, she had only earned from $200 to $300.

Appellants' appeal from the judgment is based upon the following contentions:

(1) The pleadings are insufficient to state any cause of action against any of the appellants;

(2) The evidence, construed most favorably to respondent, shows no false imprisonment;

(3) The trial court erred in submitting the issue of punitive damages to the jury as there was neither evidence, nor any sufficient pleading, of malice;

(4) The acts of appellants subsequent to August 15th were inadmissible; yet the court received evidence as to these on the theory that they may show malice, and that the trial court's instructions on malice constituted reversible error;

(5) There was no evidence to justify a verdict so grossly excessive;

(6) The trial court erred in excluding evidence of respondent's admissions which were contained in her verified pleading in her action against Mrs. Sturdevant, and which were contrary to her testimony.

The first contention of appellants as to the insufficiency of the pleadings is without merit. The allegations of

the complaint set forth in appellants' brief state that plaintiff was cross-examined at the branch office for one hour, that she was taken to the main office and cross-examined for an additional two hours, that plaintiff was told if she did not confess the matter would be turned over to the FBI, that said detention and cross-examination were against her will and that she only submitted thereto because of fear of arrest and prosecution if she refused. There are further allegations that defendants led plaintiff to believe that criminal prosecution would be instituted, that defendants adopted a threatening attitude, and that plaintiff was put in fear of her personal safety.

Appellants contend that in order to constitute false imprisonment there must be actual physical restraint or a threat to immediately apply force to effect such restraint, that fear of prosecution or litigation is not sufficient, and that no threat of arrest or prosecution is alleged. The threat of force in an action for false imprisonment need not be express—it may be implied (*Moffatt* v. *Buffums' Inc.*, 21 Cal.App.2d 371 [69 P.2d 424]); the threats may be by conduct or words (*Vandiveer* v. *Charters*, 110 Cal.App. 347 [294 P. 440]; 22 Am.Jur. 359). Certainly, the allegations of the complaint sufficiently state an implied threat of force. Furthermore, in the absence of a demurrer and after judgment, the complaint must be construed most favorably to respondent's case and all legitimate inferences from the facts alleged must be drawn in favor of the respondent (*Milovich* v. *City of Los Angeles*, 42 Cal.App. 2d 364 [108 P.2d 960]).

As to their second contention that the evidence shows no false imprisonment, appellants again argue that there was no force or threat of force, that fear of litigation or investigation or a criminal proceeding is not sufficient. Appellants seek to point out the care exercised by the bank officials in their investigation and the reasonableness of the assumption of guilt of respondent in view of the Palm Springs shortages, which they urge improved upon respondent's transfer, and her statement that she would sign a confession.

False imprisonment is the unlawful violation of the personal liberty of another (Pen. Code, § 236). And whether the violation of the personal liberty of another is treated as a tort or a crime, the definition is the same (*Dillon* v. *Haskell*, 78 Cal.App.2d 814, 816 [178 P.2d 462]; *Donati* v. *Righetti*, 9 Cal.App. 45, 48 [97 P. 1128]).

The use of actual physical force in detaining a person

is not a prerequisite to unlawfully violating the personal liberty of another. As was said by this court in *Ware* v. *Dunn,* 80 Cal.App.2d 936, 943 [183 P.2d 128], "All that is necessary to make out a charge of false imprisonment is that the individual be restrained of his liberty without any sufficient complaint or authority therefor, and it may be accomplished by words or acts which such individual fears to disregard. Temporary detention is sufficient, and the use of actual physical force is not necessary." And, in *Moffatt* v. *Buffums' Inc.,* 21 Cal.App.2d 371, 374 [69 P.2d 424], the court said: "Any unlawful exercise of force, or express or implied threat of force, by which in fact any person is deprived of his liberty and compelled to remain where he does not wish to remain is a false imprisonment."

It is not the province of an appellate court to weigh the evidence (*Estate of Isenberg,* 63 Cal.App.2d 214 [146 P.2d 424]; 2 Cal.Jur. 921 et seq.). ▮ The jury could reasonably infer from the evidence that there was force, a threat of force, or an implied threat of force both from the physical facts and from the fact alone that an absolutely innocent person stated that she would sign a confession. ▮ Immediately before the interview with plaintiff, there was evidence that both Mr. Vogelsang and Mr. Sigler had some doubt as to the truth of Mrs. Sturdevant's charge; evidence at the trial showed that the Palm Springs branch had a reputation for overages and shortages; Mr. Sigler relied upon a telephone report for his assumption that plaintiff had used her Palm Springs shortages for a vacation trip and it was proved at the trial that plaintiff had made a withdrawal of her savings for that purpose.

With reference to appellants' claim of the care allegedly exercised by the bank officials in their investigation and the reasonableness and probable cause for assuming the guilt of respondent, and therefore detaining her, it should be noted that while it is true that where a person has reasonable grounds to believe that another is taking his property *as distinguished from those cases where the offense has been completed,* he is justified in detaining the suspect for a reasonable length of time for the purpose of investigation in a reasonable manner, the evidence in the instant case clearly discloses that respondent was not detained for the purpose of investigation but, on the contrary, was detained for the purpose of securing a confession to the theft of money at a prior time and to

obtain restitution of said money from respondent. But even if a showing of the lack of care exercised by the bank in its investigation were essential to a cause of action for false imprisonment where an alleged offense has been completed, the jury was entitled to reasonably infer from the above evidence that the bank officials had not proceeded carefully and had not acted upon probable cause.

■ The appellants further contend that the evidence shows no cause of action for false imprisonment against the individual bank officials. However, the inference might reasonably be drawn that the individual bank officials actively supervised and directed the false imprisonment (*Moffatt* v. *Buffums' Inc., supra*, p. 375.)

■ As to the third contention of appellants, the issue of punitive damages was properly submitted to the jury. The jury could reasonably infer both from the facts alleged and the evidence that the defendants were guilty of oppression, fraud, or malice, express or implied (5 Cal.Jur. 10-Yr.Supp. (1944 Rev.), False Imprisonment, § 13, p. 1024). The jury was entitled to consider the fact that appellant bank refused to reinstate respondent when her innocence was not only proven but actually demonstrated. They had a right to consider whether the bank's report to the federal authorities was fair and truthful. The jury could also consider whether when respondent's innocence was conclusively established, appellant bank's letter to the federal authorities amounted to an unequivocal retraction of the charges. The jury also had for consideration the letter hereinabove set forth written to a prospective employer of respondent and could draw therefrom such inferences of malice toward respondent as might be justified from a consideration of such letter in the light of the real reason for the latter's discharge, and that such reason was subsequently proven to be groundless.

Appellants point out that the trial court ruled the slander count insufficient as malice had not been sufficiently pleaded. Whether or not the trial court was in error in so ruling is not an issue on this appeal.

■ The fourth contention of appellants is an objection to the admission of evidence as to acts subsequent to August 15th on the theory of the trial court that they showed malice and that the trial court's instructions on malice should have been omitted inasmuch as malice was not in issue. Appellants point out that the letters to the FBI and the National Bank Examiner were merely the fulfillment of a duty of the bank;

that the letter to the prospective employer was justified on the basis of the Palm Springs shortages; that refusal to rehire and termination of services are privileges of an employer; that plaintiff was not damaged by the debiting of her savings account. This contention of appellants is primarily based on the erroneous assumption that the issue of malice was neither pleaded nor proved, hereinabove considered. The jury could reasonably infer from the wording of the letters written by the bank a malicious intent—the letters reporting the missing deposit to the proper authorities contained what subsequently proved to be untrue statements and the letters purporting to retract the accusation suggested a doubt as to the honesty of respondent; the letter of reference was not justified on the basis of the Palm Springs shortages inasmuch as shortages were common at the Palm Springs branch and the jury could reasonably infer that the bank itself at the time the shortages occurred could not have considered them of moment or plaintiff would not have been retained as an employee thereafter. The debiting of plaintiff's account, the refusal to reinstate her in her employment, and failing to notify her immediately that the deposit was found were all factors to be considered by the jury in fixing punitive damages for malice and oppression.

As to the fifth contention of appellants, in view of the foregoing facts it cannot reasonably be said that in awarding respondent $30,000 damages the jury was actuated by passion and prejudice. Plaintiff suffered loss of health and loss of employment for which she was entitled to compensatory damages, and the remainder of the $30,000 is punitive damages against the officials of the bank and the bank, which it was stipulated had capital surplus and undivided profits of $284,-000,000. It was proper in the awarding of punitive damages to consider the wealth of defendant bank.

As to the last contention of appellants that it was error to exclude from evidence the complaint against Mrs. Sturdevant filed in a separate action and the compromise thereof in the amount of $3,500, the admissions of the complaint are not basically at variance with respondent's position in the present action. Furthermore, the only wrong charged against Mrs. Sturdevant, namely, the alleged slander uttered by her, was an entirely different wrong from that charged against appellants. The damages sustained by respondent as a result of Mrs. Sturdevant's charges were different from those she sustained by reason of appellants' conduct. In fact, such

charges occurred and were made prior to the first of appellants' wrongful acts, namely, the accusation of dishonesty and defalcation made against respondent. When the purpose and object of punitive damages are considered, viz., punishment of a particular defendant for malice, fraud, or oppression, it is at once manifest that the compromise agreement made with Mrs. Sturdevant could not in any way alleviate the wrongful acts of the appellants or mitigate the punitive damages awarded in the present action against them.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied May 4, 1950, and appellants' petition for a hearing by the Supreme Court was denied June 12, 1950.