[Crim. No. 43263. Second Dist., Div. Four. Jan. 9, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL MARTINEZ et al., Defendants and Appellants.

580

584

COUNSEL

Mary J. Madsen and Robert S. Gerstein, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, William R. Weisman and Frederick Grab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KINGSLEY, Acting P. J.—Upon trial by jury, defendants were each convicted of 16 criminal offenses and sentenced to state prison. Defendant Martinez received a sentence of 47 years plus 2 consecutive life terms; defendant Chavez, 54 years plus 2 consecutive life terms. Both defendants have appealed, essentially contending that the enormity of these sentences is due to improper conviction under a statute that was not meant to apply to their conduct, and to numerous instances of double conviction and punishment in violation of Penal Code section 654.[1] Because we agree in part with these contentions, we reverse the judgment in part, as set forth below.

---

[1]All statutory references are to the Penal Code.

This case arises from crimes committed in the home of Donald and Martha Goodfellow during the hours of 3 to 4 on the morning of February 28, 1982. At about 3, defendant Chavez rang the Goodfellows' doorbell, and when Donald answered, forced his way into the living room by holding a screwdriver to Donald's back. Defendant Martinez then entered and took control of Donald by holding his own screwdriver to Donald's neck. Chavez went into the bedroom and told Martha that if she screamed her husband would be hit or shot by Martinez. Chavez took an alarm clock, a baseball cap, car keys, Donald's driver's license, and some coins from the dresser. He then made Martha submit to three acts of sexual intercourse, pushing the screwdriver against her neck during part of the third act.

Meanwhile, Martinez had tied Donald up with strips from Donald's bathrobe. He came into the bedroom briefly and rubbed Martha's arm, but left when Chavez told him to go back and watch Donald as there was "plenty of time." During the third act of intercourse, Martinez again entered the bedroom to tell Chavez that Donald had escaped. Chavez left the bedroom and Martinez performed a fourth act of intercourse with Martha.

Chavez returned to attempt to disable the telephone and to ask Martha how to open the garage door. He ran back out of the bedroom, however, when Martha heard her husband call her name. At that point, Martha told Martinez to get out. Martinez went to the door of the adjoining bathroom and was there pulling his pants on when police officers, who were then in the living room, ordered Chavez to freeze. Chavez, from the hallway, yelled, "We have a hostage" and said something to indicate that the hostage would be hurt if he was not allowed to leave. Martha ran down the hallway into the arms of her husband; as she ran past Chavez, he tried to stop her by grabbing her hair, but was unable to do so. The police then arrested both defendants.

Defendants were charged and convicted of: conspiracy to rape and rob (§ 182); burglary with use of a deadly weapon by Chavez (§§ 459, 12022, subd. (b)); four forcible rapes in concert, while armed with (Martinez) or using (Chavez)[2] a deadly weapon (§§ 261, subd. (2), 264.1, 12022.3); robbery of Donald Goodfellow with use of a deadly weapon (§§ 211, 12022, subd. (b)); robbery of Martha Goodfellow, with (Chavez) use of a deadly weapon (§§ 211, 12022, subd. (b)); two assaults upon Donald with a deadly weapon (§ 245, subd. (a)); assault upon Martha with a deadly weapon (§ 245, subd. (a)); two false imprisonments of Donald, with use of a deadly weapon by Chavez in one imprisonment and by Martinez in the other

---

[2]Chavez was not charged with a weapon enhancement in the fourth rape.

(§§ 236, 12022, subd. (b)); and false imprisonment of Martha with (Chavez) use of a deadly weapon (§§ 236, 12022, subd. (b)).

In addition to the foregoing, both defendants were charged and convicted of kidnaping Donald for ransom and extortion under section 209, subdivision (a), and of kidnaping Martha for ransom or extortion under the same section. It is the propriety of these latter convictions that we first address.

I

There are three types of kidnaping in California. Simple kidnaping is proscribed by Penal Code section 207 and punishable by a maximum term of seven years. Kidnaping for robbery is proscribed by section 209, subdivision (b) and punishable by life imprisonment with possibility of parole. Kidnaping for ransom or extortion or to exact money or any valuable thing from a person other than the kidnap victim is proscribed by section 209, subdivision (a); it is punishable by life imprisonment, with the possibility of parole if the kidnap victim is not harmed, and with no possibility of parole if the victim suffers bodily harm.[3]

In the present case, defendants were convicted of kidnaping Donald Goodfellow for ransom or extortion, the most serious form of kidnaping recognized in this state. The People's theory was, and is, that, by restraining Donald and threatening Martha that he would be harmed if she screamed or interfered in the robbery, the defendants confined Donald to exact Martha's cooperation in the robbery (a "valuable thing") within the meaning of section 209, subdivision (a). The prosecutor acknowledged that this theory of aggravated kidnaping would encompass all robberies in which the robber holds a gun on two persons and says to one of them that he will harm the other if his demand for money is refused.

Defendants now challenge the conviction, arguing that section 209 cannot have been intended to reach conduct that is essentially a multivictim robbery. In support of their contention, they trace the history of section 209

---

[3]Section 209 provides in full: "(a) Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes such person to a substantial likelihood of death, or shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm. [¶] (b) Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole."

and point to various anomalies that would result from interpreting subdivision (a) to apply to the facts of this case. We agree with their arguments and find that no kidnaping of Donald occurred.

Prior to 1933, aggravated kidnaping as defined in section 209 required some movement of the victim; the statute proscribed taking or enticing away any person in order to commit robbery or extortion or to exact any valuable thing. The statute was amended in 1933, as part of a nationwide response to the Lindbergh kidnaping. (See *In re Dennis* (1975) 46 Cal.App.3d 50 [120 Cal.Rptr. 267].) In the amended statute, movement was no longer required; instead of taking or enticing away, the statute proscribed mere seizure or confinement with the intent to rob, extort, or exact a thing of value. (See *People v. Macinnes* (1973) 30 Cal.App.3d 838 [106 Cal.Rptr. 589].) In *People v. Knowles* (1950) 35 Cal.2d 175 [217 P.2d 1], our Supreme Court observed that the amended language effectively allowed all robberies involving the slightest detention to be prosecuted as aggravated kidnapings, but held that any doubts as to the wisdom of such a result must be addressed not to the courts but the Legislature. The Legislature responded to *Knowles* in the following year. In 1951 it amended the statute to require an element of asportation in all kidnaps *for robbery*. The definition of kidnap for ransom or extortion, however, remained essentially unchanged, still requiring no act beyond seizure or confinement. All aggravated kidnapings, whether done for the purpose of robbery, ransom or extortion, were made punishable by death or life without parole if the victim was harmed, and by life with the possibility of parole if he was not.[4]

In accordance with the 1951 bifurcation of aggravated kidnapings into those requiring asportation and those not, two lines of authority arose, one dealing with cases of kidnap for ransom or extortion and the other with kidnap for robbery. The first line is still somewhat rudimentary, and as we shall see, includes no case similar to the one at bar. The line of authority treating the parameters of kidnap for robbery is extensive, and does include several cases with facts similar to the one at bar. Since our resolution of the instant case should be in harmony with both lines to the extent that it should not offend the principles expressed in either, we briefly summarize both lines of authority.

The kidnap for ransom and extortion cases have recognized four-fact situations which show this form of aggravated kidnaping. *People v. Dacy* (1970) 5 Cal.App.3d 216 [85 Cal.Rptr. 57] dealt with the classic kidnap for

---

[4]Subsequent amendments to section 209 made no substantial changes, except to preclude the death sentence for all forms of aggravated kidnaping and to reserve the harshest penalty, life without possibility of parole, for ransom or extortion kidnapings.

ransom situation; there, the kidnap victim was abducted from his home and held in seclusion while ransom was demanded of his family. *People* v. *Macinnes, supra,* 30 Cal.App.3d 838, treated a different situation, one in which the kidnap victim is not moved, but the recipient of the ransom demand is. There, the defendants entered a home containing three people, held two of them hostage in the home, and took the third to another place where he could obtain money as ransom for the hostages. *People* v. *Anderson* (1979) 97 Cal.App.3d 419 [158 Cal.Rptr. 727], represents a third situation, in which neither the kidnap victim nor the recipient of the ransom-demand is moved. There the defendants entered a couple's home while the husband was away, held the wife there, and attempted to telephone the husband to demand ransom. A fourth situation was recognized in *Magee* v. *Superior Court* (1973) 34 Cal.App.3d 201 [109 Cal.Rptr. 758]. The *Magee* court held that a kidnap for extortion may be shown by a defendant seizing a person and holding him hostage in order to induce police officers to refrain from resisting and stopping the defendant's criminal acts. To date, no case has held that a kidnap for ransom or extortion is shown by detaining two people during a robbery and threatening one of them with harm to the other should cooperation be withheld.

The leading kidnap for robbery cases have taken a different route. They have been concerned not so much with describing the types of situations that can be characterized as aggravated kidnaping, but with describing those situations that *cannot* be so characterized, consistent with the intent of the 1951 Legislature. Three cases are representative of this series. In *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898], the Supreme Court held that the bodily harm that could elevate aggravated kidnaping to a capital offense did not include normal types of bodily harm that are incident to most kidnapings. The court reasoned: "If the more serious penalty may be imposed when the only injury is of a nature similar to that shown by the present record, which concededly is almost necessarily an incident to every forcible kidnaping, neither the purpose of enhancement of the penalty for the more heinous crime nor the intention of deterring the kidnaper from killing or injuring his victim is subserved." (*Id.,* at p. 517.) In *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], the court held, 18 years after the 1951 amendment, that the asportation element that elevates robbery to the more serious crime of kidnaping for robbery does not include slight or trivial movements that are incident to most robberies. In 1971, fully 20 years after the 1951 amendment, the court held in *People* v. *Tribble* (1971) 4 Cal.3d 826 [94 Cal.Rptr. 613, 484 P.2d 589], that in order to elevate the crime of simple (§ 207) kidnaping and robbery to the aggravated crime of kidnaping for robbery, the defendant must form the intent to rob at or before the time the kidnaping commences.

Of these cases, *Daniels* is the most far-ranging in its implications, and we therefore examine it in some depth. Until *Daniels,* the courts had recognized that the 1951 amendment added an element of asportation to the crime of kidnaping for robbery, but they had maintained that any degree of movement, however slight or trivial, would suffice: "It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state." (*People* v. *Chessman* (1951) 38 Cal.2d 166, 192 [238 P.2d 1001]; *People* v. *Wein* (1958) 50 Cal.2d 383 [326 P.2d 457].) Thus, for almost two decades after 1951, the courts continued to uphold convictions of kidnaping for robbery in cases where the victims had been moved only a few paces in virtually "standstill" robberies.

*Daniels* reexamined this practice. Referring back to its reasoning in *Jackson, supra,* the court noted that just as some types of bodily injury are almost necessarily an incident to the crime of kidnaping, so too some degree of movement is nearly inevitable in the crime of robbery. "'It is difficult to conceive a situation in which the victim of a robbery does not make some movement under the duress occasioned by force or fear.'" (71 Cal.2d at p. 1134, quoting Enright, *California's Aggravated Kidnapping Statute—A Need for Revision* (1967) 4 San Diego L.Rev. 285.) *Daniels* questioned whether the Legislature could have intended for the standard robbery situation to lead to a prosecution for aggravated kidnaping, or for prosecutors to have an unlimited option to charge either robbery or kidnaping for robbery. (*Id.,* at p. 1134, fn. 8.) The court concluded that it was not the Legislature's intent to allow the aggravated kidnaping statute to be used to prosecute normal robberies. It therefore adopted the following rule: [W]e hold that the intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies [citation] but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.,* at p. 1139.)

Finally, *Daniels* noted that its holding was in keeping with a "current of common sense in the construction and application of [kidnap] statutes" that had arisen throughout the nation during the 1960's. (*Id.,* at p. 1127.) Each of the sources which *Daniels* so characterized had one aspect in common: they had all argued that the scope of kidnaping statutes should not be so broad as to include conduct which is integral to other lesser crimes and which does not constitute "kidnaping" in any reasonable sense of the word. We shall return to some of this authority below.

Two principles emerge from these two lines of post-amendment authority. First, according to *Daniels* and its progeny, the aggravated kidnaping stat-

ute, as amended in 1951, was not intended to apply to the "normal" robbery situation. Second, according to the kidnaping for ransom line, the amended statute *is* intended to apply to those situations involving a primary and secondary victim, where one of the victims is held or taken away and the other is subjected to a ransom or extortion demand. The problem with the instant case is that, while it might technically fall within this second category, we do not think that the purported kidnap victim was subjected to any greater confinement or risk of harm than is incident to a "normal" multivictim robbery. To hold this case to be an aggravated kidnaping would therefore seem to defeat the rationale of *Daniels* and to defy the ameliorative purpose of the 1951 amendment.

The Attorney General argues that we must ignore *Daniels* and its progeny, since they apply only to the crime of kidnaping for *robbery*. It is argued that the present case, although obviously a robbery, falls technically within the definition of a kidnaping *for ransom* and more importantly, was charged as a kidnaping for ransom. Hence the *Daniels* rationale can have no application here.

We think that the *Daniels* rationale does apply, however, for the following reasons.

First, *Daniels* has been uniformly held to control those cases where, as here, multiple victims have been detained in the course of a robbery and each put in fear for the safety of the other as well as himself. In 1971, the Supreme Court reversed kidnaping for robbery convictions in three such cases, under the authority of *Daniels*. (*People* v. *Ungrad* (1971) 4 Cal.3d 420 [93 Cal.Rptr. 741, 482 P.2d 653]; *People* v. *Killean* (1971) 4 Cal.3d 423 [93 Cal.Rptr. 742, 482 P.2d 654]; *People* v. *Hunter* (1971) 4 Cal.3d 432 [93 Cal.Rptr. 746, 482 P.2d 658].) Each of these cases was a residential robbery in which the robbers found multiple persons at home, and moved them from room to room in search of valuables. In such a situation, we think it apparent that there exists an implied—if not always express—threat to harm any or all of the victims if one of them resists. That threat may not have been express in *Ungrad, Killean,* or *Hunter,* but it was in another case, *People* v. *Cheffen* (1969) 2 Cal.App.3d 638 [82 Cal.Rptr. 658]. In *Cheffen,* another residential robbery, the defendant and a companion entered a couple's house by a ruse and then threatened them with firearms. The threat was that if they did not show the defendant the location of their wall safe, "they would *both* be dead." (*Id.,* at p. 641, italics added.) During the course of the robbery, the husband was forced to lie still on the floor, he and his wife were made to move from room to room, and both of them were at some point tied up. The two convictions of kidnaping for robbery were reversed because, per *Daniels,* these movements were incidental to

the robbery and did not substantially increase the risk of harm beyond that inherent in the robbery itself.

To say that these cases are not aggravated kidnapings and not even *simple* kidnapings, but that the instant case is the most severe type of aggravated kidnaping, is to make an untenable distinction. Here, there was no different or greater confinement or risk of harm than in these cases, and the nature of the threat here was certainly no different than in *Cheffen.* The only real difference is that *Ungrad* et al. were charged as kidnaping for robbery, while the instant case was charged as a kidnaping for ransom on the theory that one of the victim's cooperation in the robbery was a "thing of value." That distinction is untenable because every case in the *Ungrad* series, and particularly *Cheffen,* could be construed to fall within the meaning of kidnaping for ransom on this theory, yet all were held under *Daniels* to be nothing more than multivictim robberies. To hold that the present case is not only more than a robbery, but is the severest form of kidnaping recognized in this state, would seem to circumvent these cases by allowing the difference between multivictim robbery and aggravated kidnaping to depend simply on which subdivision of section 209 the prosecutor happens to charge.

Secondly, we note that the robbery statutes themselves contemplate the kidnaping for ransom theory of the present case as nothing more than a standard robbery situation. Penal Code section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Section 212 states that the "fear mentioned in section 211 may be . . . [t]he fear of an immediate and unlawful injury *to the person* or property *of anyone in the company of the person robbed at the time of the robbery.*" (Italics added.) It is hard to conceive a robbery accomplished by fear of injury to a companion unless the companion is seized or confined. Thus, the *Daniels* notion that standard robbery situations do not constitute kidnapings would seem to apply not only to single victim robberies, but also to those where one victim is confined while another is compelled to cooperate out of fear for him.

■ To summarize thus far, it has been held per *Daniels* that the purpose of the 1951 amendment to section 209 was to distinguish between standard robberies and aggravated kidnapings, and to prevent the former crime from being converted into the latter on the prosecutor's whim. (See, e.g., *In re Dennis, supra,* 46 Cal.App.3d 50, 56; *People* v. *Daniels, supra,* 71 Cal.2d 1119, 1134.) Consistent with that purpose, the courts have treated multivictim robberies no differently than single-victim robberies, and have held that movements which are incident to a multivictim robbery and which fail

to substantially increase the risk of harm do not establish kidnaping of any sort. This is so even when one of the robbery victims is expressly induced to cooperate out of fear for another. Thus, insofar as *Daniels* can be taken to mean that some conduct different or more dangerous than that incident to standard robberies must be shown in order to make up a kidnaping, it is clear that the *Daniels* rationale applies to situations where the victim of a robbery is placed in fear for his restrained companion, *if* the restraint is incident to the robbery and does not substantially increase the risk of harm beyond that inherent in the robbery itself. This application should not be defeated by the arbitrary device of charging such conduct as a kidnaping for ransom unless we are to revert to the discredited practice of allowing the difference between robbery and aggravated kidnaping to hinge solely on what crime the prosecutor happens to charge.

■ There are, moreover, additional reasons why the *Daniels* rationale cannot rationally be restricted to those robberies charged as kidnap for robbery.

First, the *Daniels* holding makes sense in part because of the great difference between the penalties for robbery and kidnaping for robbery.[5] If the penalties for the two crimes were equivalent, there would be far less reason to think that the Legislature did not mean to allow the same conduct to be prosecuted as either crime. In part, it is *because* the penalties for the two crimes are so disparate that it makes sense to say that the greater crime cannot be shown by conduct merely incident to the lesser crime. This reasoning applies with greater force when the penalties for robbery and kidnaping *for ransom* are compared. At the present time, armed robbery perpetrated on two victims is punishable by a maximum term of eight years (§§ 213, 1170.1, subd. (a), 12022.5). As we have noted, it is standard—if not inevitable—in multivictim robbery situations for both victims to be detained and each put in fear for the other. (See, e.g., *People* v. *Cheffen, supra,* 2 Cal.App.3d 638.) It is also the fact that victims of robbery are often made to suffer bodily harm. When that happens to one of the victims in a dual-victim robbery, the Legislature has provided for an additional penalty of three years, to a total of eleven. (See §§ 1170, subd. (e); 12022.7.) But to charge such conduct, which is normal in multivictim robberies, as kidnaping for ransom is to make it punishable by a life sentence at the minimum and life without possibility of parole at the maximum. (§ 209, subd. (a).) Not even kidnaping for robbery allows this latter penalty, which is otherwise reserved for only the most culpable forms of first degree murder. (§§ 190, 190.2, 190.25.) Under these circumstances, we think it

---

[5]At the time *Daniels* was written, the maximum penalty for kidnap for robbery with bodily injury was death; the penalty for robbery with *great* bodily injury was 15 years to life.

would be highly anomalous to recognize that the enhanced penalties for kidnaping for robbery were not meant to apply to the standard robbery situation, while allowing the severest penalty short of death to apply to multivictim robberies simply because they are charged as kidnapings for ransom.

Secondly, contrary to the Attorney General's argument, the *Daniels* rationale cannot reasonably be restricted to kidnaps for robbery on the asserted ground that *Daniels* relied on an asportation element that is not required in kidnapings for ransom. Although the *Daniels holding* was specifically designed to define the asportation element of kidnapings for robbery in such a way that would distinguish aggravated kidnaping from robbery, the *rationale* of *Daniels* was in no way dependent on the concept of asportation. The rationale, as opposed to the precise holding, was that this state's aggravated kidnaping statute should not be construed to apply to conduct which is no different or more culpable than that incident to lesser crimes. For that rationale, *Daniels* relied on a nationwide "current of common sense" that was exemplified in two New York kidnaping cases. (*People* v. *Levy* (1965) 15 N.Y.2d 159 [256 N.Y.S.2d 793, 204 N.E.2d 842] and *People* v. *Lombardi* (1967) 20 N.Y.2d 266 [282 N.Y.S.2d 519, 229 N.E.2d 206], discussed at 71 Cal.2d 1119, 1134-1137.) These cases, which held that kidnaping is not shown by movement *or confinement* that is merely incident to lesser crimes, interpreted a kidnaping statute that does *not* require asportation; the New York kidnaping statute addressed in *Levy* proscribed nothing more than "confin[ing] another" with intent to "cause him to be confined" against his will. (See 204 N.E.2d at p. 844.) We think it apparent that the rationale of *Daniels* relies not on the element of asportation per se, but on that element—be it asportation or stationary restraint—that makes aggravated kidnaping more culpable, different, or more dangerous than lesser, underlying crimes.

To be sure, *Daniels* was specifically addressing the situation before it, which was a standard robbery case that had been charged as the type of aggravated kidnaping that requires asportation. Hence its precise holding addressed only the quality of *asportation* that distinguishes robbery from aggravated kidnaping, and the court had no need to address the quality of *confinement* that distinguishes robbery from aggravated kidnaping. All that means, however, is that the latter task was reserved for another occasion. That occasion has arisen here.[6]

---

[6]The Attorney General confuses the holding of *Daniels* with its rationale. He argues, citing *People* v. *Macinnes, supra,* 30 Cal.App.3d 838, that the *Daniels holding* does not apply to kidnaping for ransom. In this he is obviously correct: *Macinnes,* a kidnaping for ransom case, held that since kidnaping for ransom does not require any asportation whatever, it would be nonsensical to apply the *Daniels* holding to it, i.e., to require asportation which

In short, for all of the foregoing reasons, we find that the *Daniels* rationale that the aggravated kidnaping statute not be used to prosecute conduct constituting lesser crimes is not restricted to those cases where the prosecutor has chosen to charge kidnaping for robbery. We do not share the Attorney General's concern that our Supreme Court has not yet had the occasion to apply the concerns expressed in *Daniels* to the crime of kidnaping for ransom or extortion. As 18 years elapsed between the enactment of our modern aggravated kidnaping statute and the time that kidnaping *for robbery* was construed so as not to overrun lesser crimes, it is to be expected that the less commonly occurring crime of kidnaping *for ransom* has not yet been accorded similar scrutiny. We do, however, think it proper to confine our holding as narrowly as the issue before us permits. As a court of intermediate appellate jurisdiction, we do not design our resolution of the instant case so to define the limits of kidnaping for ransom for all intents and purposes. Rather, we limit our holding to what is necessary to prevent the *Daniels* line of cases from being circumvented by charging what is essentially a multivictim robbery as a kidnaping for ransom. Any further refinements are left to other forums and other cases.

The *Daniels* court stated: "[W]e hold that the intent of the Legislature in amending Penal Code Section 209 in 1951 was to exclude from its reach . . . those [robberies] in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (71 Cal.2d at p. 1139.) We now hold that that holding would be circumvented if either subdivision of section 209 is construed to reach those multivictim robberies in which the movement *or restraint* of the purported kidnap victim is merely incidental to the commission of the robbery and does not substantially increase the risk of harm over and above that necessarily present in the crime of the robbery itself. By "multivictim robberies" we mean those robberies in which more than one person is subjected to force or fear, regardless of whether each such person is made the subject of a separate robbery count or not.

The Supreme Court's holding in *People* v. *Stanworth* (1974) 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058] is no obstacle to our holding. Contrary to the Attorney General's suggestion, *Stanworth* did not proscribe application of the *Daniels'* rationale to kidnaping for ransom. Rather, *Stanworth* held only that the *Daniels* rule is inapplicable to the charge of *simple* (§ 207) kidnaping. In *Stanworth*, the defendant was convicted of several

---

is nonincidental to an underlying crime and which increases risk of harm. The *Macinnes* court did not decide or even consider, however, whether and in what manner the rationale of *Daniels* might apply to kidnaping for ransom. This latter question, which is the one before us here, is an issue of first impression in this state.

counts of simple kidnaping. The court stated: "Defendant takes the position that the rule announced by us in *Daniels* applies not only to aggravated kidnaping (§ 209) but to so-called simple kidnaping (§ 207). We shall explain that *Daniels* does not apply to the latter classification." (11 Cal.3d at p. 596.) The reason for that holding was that simple kidnaping, unlike the kidnaping for robbery situation discussed in *Daniels,* can occur in the absence of an underlying robbery, and in the absence of any underlying crime at all. Thus, the court explained, "where only simple kidnaping is involved, it is clear that the victim's movements cannot be evaluated in the light of [the *Daniels*] standard which makes reference to the commission of another crime." (*Id.,* at p. 600.) Our holding in the instant case is restricted by definition to those situations where the underlying crime of robbery is necessarily present and forms the basis for an aggravated kidnaping charge. In such situations, it is clear that the restraint of the victim *can* "be evaluated in the light of [the *Daniels*] standard which makes reference to the commission of another crime." Indeed, as we have explained above, such an evaluation *must* be made in cases of aggravated kidnaping bottomed on multivictim robberies, in order to avoid making *Ungrad, Killean, Hunter* and *Cheffen* into dead-letters and thereby eviscerating *Daniels* itself.

Our holding leaves intact the multivictim robbery cases such as *Ungrad, Killean, Hunter* and *Cheffen,* which were held to be outside the scope of the aggravated kidnaping statute. In each of these cases, despite implied or express threats that a person under restraint would be harmed if one of the robbery victims failed to cooperate, all restraints and movements were merely incidental to the robbery itself and did not increase the risk of harm. Equally important, our holding leaves intact every theory upon which the crime of kidnaping for ransom or extortion has heretofore been founded. In *People* v. *Dacy, supra,* 5 Cal.App.3d 216, since the kidnap victim was abducted, his confinement and movement were not incidental to a robbery, and the risk of harm to him was greater than it would have been had he and the recipient of the ransom merely been robbed. In *People* v. *Macinnes, supra,* 30 Cal.3d 838, since the victim of the robbery was taken away from the kidnap victim, the restraint of the kidnap victim was not incidental to the robbery, and it created a greater risk of harm than would have existed had the two victims merely been robbed in place. In *People* v. *Anderson, supra,* 97 Cal.App.3d 419, since the would-be recipient of the ransom demand was at all times remote from the kidnap victim, the detention of the latter was not incident to any robbery, and again, the risk of harm to her was greater than it would have been had only a robbery occurred. In the hostage situation described by *Magee* v. *Superior Court, supra,* 34 Cal.App.3d 201, since the kidnap victim is held to facilitate an escape rather than a commission of robbery, the holding is beyond that incident to the commission of robbery, and accordingly increases the risk of harm. In all

of these situations, the movement or restraint of the kidnap victim enlarges the scope of what would otherwise be a robbery or extortion, and exposes him to a greater risk than would be the case if he and/or the person subjected to the ransom or extortion demand were simply robbed.

In the instant case, the jury was instructed that the "act of seizing or holding someone against his will and then exacting cooperation from a friend or relative by threatening that the person so seized or held will be injured or killed constitutes a violation of Penal Code Section 206."[7] The jury was not told to decide, and therefore, did not decide, whether the holding of Donald Goodfellow was incidental to the robbery of himself and his wife or whether it increased his risk of harm beyond that inherent in the robbery. We think it plain that the restraint here was no less incidental and no more dangerous than that which occurred in *Ungrad, Killean, Hunter* and *Cheffen*. ■ As stated by our Supreme Court in *People* v. *Ramos* (1982) 30 Cal.3d 553, 589 [180 Cal.Rptr. 266, 639 P.2d 908], "To constitute robbery the property must be removed from the possession and immediate presence of the victim against his will, and such removal must be by force or fear. When two or more persons are in joint possession of a single item of personal property, the person attempting to unlawfully take such property must deal with *all* such individuals. *All* must be placed in fear or forced to unwillingly give up possession." (Italics added.) In order to take the Goodfellow's property from their dresser, the defendants had to deal with both Donald and Martha in some way. The movements of both of them had to be controlled and the resistance of both of them quelled, and whether this was accomplished by restraining them in one room or by marching them through the house makes no legally cognizable difference. Accordingly, the count II convictions of kidnaping Donald Goodfellow are reversed.

## II

■ The conviction of kidnaping Martha Goodfellow for ransom or extortion presents another novel issue. The People's theory is that this charge was proven by the defendants' holding of Martha as a hostage in order to "extort" the police, i.e., in order to induce the police not to do

---

[7]The jury instructions went on to explain the concept of "exacting cooperation" in the following terms: "It is sufficient to support the conviction if the person making the threat demands anything of value from a victim. The thing of value can include cooperation from a victim in terms of (1) assisting a defendant in the location of valuable property, (2) promising to cooperate with a defendant by allowing him to obtain valuable property without resistance, or (3) promising not to summon aid by calling or screaming for assistance." [¶] Since we reverse the kidnaping conviction under the authority of *Daniels,* we do not reach the defendants' secondary contention that the form of "cooperation" quoted above does not constitute a "thing of value" within the meaning of section 209, subdivision (a).

their duty to apprehend the defendants.[8] Although one case has held that the taking of a hostage for this purpose can constitute kidnaping for extortion under section 209 (*Magee* v. *Superior Court* (1973) 34 Cal.App.3d 201 [109 Cal.Rptr. 758] [First Appellate District, Div. Four]) we are aware of no California case in which a conviction on this theory has been subjected to scrutiny on appeal.[9]

On the appeal before us, the defendants do not claim that kidnaping of a hostage is outside the purview of section 209. Rather, they argue that such a kidnaping was not proved in this case. The defendants acknowledge that Martha was detained for the purpose of robbery and rape, and that Chavez at some point formed the intent to detain her for use as a hostage as well. But since that intent was formed after Martha's confinement had ended, and since no new confinement arose subsequently, the evidence at most proved only an attempt. The Attorney General disagrees, arguing that Martha was still confined at the time Chavez formed the intent to use her as a hostage, thus establishing a completed kidnaping. Upon examining the facts and law, we conclude that the defendants are correct.

The facts showed the following: Martinez was holding Martha on the bed incident to a rape when her husband came through the front door, followed by police. Chavez was also in the bedroom at the time making preparations to leave. When Martha's husband called her name, Chavez ran out of the bedroom and Martha told Martinez to "get off and get out." Martinez went to the doorway of the adjacent bathroom to dress himself. At that point, the police manifested their presence by ordering Chavez to "freeze." Chavez, from the hallway, responded by shouting that he had a hostage. Hearing his words, Martha immediately ran out of the bedroom, through the hallway, and up to her husband. As she passed Chavez, he tried to obtain control of her by grabbing her hair. She kicked herself loose before he could do so,[10] possibly being assisted by a shove from one of the officers.

We start by examining what acts, as opposed to intent, satisfy the requirements of a kidnaping for ransom or extortion. The statute covers "[a]ny person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps, or carries away any individual by any means whatsoever . . . or

---

[8]Penal Code section 518, defining extortion, states in pertinent part: "Extortion is . . . the obtaining of an official act of a public officer, induced by a wrongful use of force or fear. . . ."

[9]The *Magee* case arose after a mistrial. On retrial, the jury deadlocked on the question whether an aggravated kidnaping had been shown. (See *In re Carrow* (1974) 40 Cal.App.3d 924, 930, fn. 1 [115 Cal.Rptr. 601].)

[10]According to the police, the physical contact between Martha and Chavez lasted not more than a couple of seconds, or perhaps three or four.

who holds or detains such individual. . . ." (Pen. Code, § 209, subd. (a).) Here, since there was no inveigling, enticing, et cetera, and no asportation, we direct our attention to the meaning of "seizes" and "confines."[11] Since these terms are not elucidated in the few cases that discuss kidnaping for ransom or extortion, we must search elsewhere. We look to cases that treated kidnaping for robbery during the time when that crime was defined to require no act beyond seizure or confinement, and to later kidnaping robbery cases insofar as their discussion is pertinent.[12] ■ ■ ■ ■ ■ We also look to the cases on false imprisonment, since false imprisonment is a lesser-included offense of all types of kidnaping (*People* v. *Morrison* (1964) 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874]) and hence requires seizure or confinement to no greater degree than that which would establish kidnaping.[13]

Our inquiry is addressed to two questions: First, is force *necessary* to establish seizure or confinement, and second, is force necessarily *sufficient* to establish seizure or confinement. We shall conclude that both questions must be answered in the negative, and then apply these conclusions to the facts of this case.

■ First, it is clear that a person can be seized and confined without any use of force, if he submits to confinement under the compulsion of fear and if that fear is not unreasonable under the circumstances. ■ As stated in *People* v. *Gomez* (1967) 252 Cal.App.2d 844, 858 [60 Cal.Rptr. 881], a kidnaping for robbery case, "the gravamen of the offense of kidnaping is some form of compulsion, and . . . the requisite force or compulsion need not consist of the use of actual physical force or express threats. The essence of the crime is that the victim feels compelled to obey because he fears harm or injury from the accused, and his apprehension is not unreasonable

---

[11]As will become apparent in our discussion, if "holds or detains" carries some meaning beyond that conveyed by "seizes or confines," the difference has no application to this case.

[12]The Attorney General urges us to disregard such authority, on the grounds that it applies only to kidnaping for robbery to the exclusion of kidnaping for ransom or extortion. This is not the case, however, since prior to the 1951 amendment to section 209, the various forms of aggravated kidnaping differed only as to *intent,* and since we discuss post-1951 authority only insofar as it states principles common to all forms of proscribed "confinement," whether accompanied by asportation or not.

[13]Penal Code section 236 defines false imprisonment as "the unlawful violation of the personal liberty of another." The crime has been held to include any "exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty *or* is compelled to remain where he does not wish to remain, or to go where he does not wish to go. . . ." (*People* v. *Zilbauer* (1955) 44 Cal.2d 43, 51 [279 P.2d 534]; italics added.) As such, it appears to contemplate some acts less restrictive of freedom than those that compel a person to remain in one place or to move elsewhere, and as such, arguably requires a lesser intrusion than would suffice for aggravated kidnaping.

under the circumstances. [Citations]."[14] This principle is illustrated in the myriad kidnapings for robbery cases, from 1934 to the advent of *Daniels*,[15] where virtually "standstill" kidnapings were upheld on the basis that the robbery victims, without being touched by their assailants, submitted to moving a few paces and having their property taken under the compulsion of a displayed gun. ▮▮ It also follows, however, that in the *absence* of force, the use of fear to detain a person cannot establish a seizure or confinement if the person is at no time "compelled to obey." If threats and fear are ineffectual to cause confinement, and confinement is not effectuated by other means, then no seizure or confinement has occurred.

▮▮ Second, the application of physical force upon a person is insufficient to establish his seizure or confinement for purposes of kidnaping and false imprisonment if the person successfully resists the force used. In *People* v. *Knowles* (1950) 35 Cal.2d 175 [217 P.2d 1], the court defined "seizure" for the purpose of the aggravated kidnaping statute, as *"to take possession of* by force." (*Id.*, at p. 180, italics added.) *Knowles* deferred to the 1943 edition of Webster's New International Dictionary, unabridged. The 1981 edition similarly stresses the obtaining of possession, listing "to take possession of" as the primary relevant meaning of "seize."[16] Our examination of the pre-1951 (i.e., "standstill") kidnaping for robbery cases discloses no case where the requisite seizure was established by an unsuccessful attempt to take physical control of the victim. Also, it is doubtful whether such an unsuccessful attempt would give rise even to the lesser crime of false imprisonment. ▮▮ ▮▮▮ ▮ We can find no case of false imprisonment, whether criminal or tortious,[17] where the victim's resistance to force was not sufficiently quelled to enable his assailant to possess him. Absent such possession, the application of force reasonably establishes not false imprisonment or kidnaping, but assault.

Of course, if the would-be kidnaper who seeks to confine his victim by force attains his end without having to resort to force, then a confinement under the compulsion of fear may be established under the first principle discussed above. (*People* v. *Gomez, supra,* 252 Cal.App.2d 844.) Thus, a victim who submits to confinement under the threat of assault is confined

---

[14]The false imprisonment cases are in accord. (See, e.g., *People* v. *Haney* (1977) 75 Cal.App.3d 308, 313 [142 Cal.Rptr. 186]; *People* v. *Zilbauer, supra,* 44 Cal.2d 43, 51; *Parrott* v. *Bank of America* (1950) 97 Cal.App.2d 14, 22-23 [217 P.2d 89, 35 A.L.R.2d 263].)

[15]*People* v. *Daniels, supra,* 71 Cal.2d 1119, discussed in section I, *ante.*

[16]Other relevant meanings given are "to possess or take by force," "to take prisoner," "to take hold of," and "to possess oneself of."

[17]The tort of false imprisonment is identical to the crime as defined in section 236. (*City of Newport Beach* v. *Sasse* (1970) 9 Cal.App.3d 803, 810 [88 Cal.Rptr. 476].)

for as long as he submits to the threat, though no assault ever occurs. On the other hand, if there is no discernible time in which the victim submits to confinement out of fear of assault, then no confinement has occurred.

■ We now apply these principles to the question whether Martha Goodfellow was seized or confined during or after the time Chavez formed the intent to hold her hostage.

There can be no question that Martha was confined during the entire course of the robbery and rapes, including those intervals in which no force was applied to her person. ■ A defendant, having compelled his victim to remain in one place by means of force and threat, need not continuously repeat the force and threats in order to retain control. As long as the victim feels compelled to remain confined out of reasonable fear, the confinement continues to exist. (*People* v. *Gomez, supra.*)

By the same token, however, a confinement maintained only through fear of force ceases when the fear is no longer sufficient to hold the victim. ■ Here, as soon as her husband called out her name, Martha ordered Martinez off and out, and he obeyed. Chavez, without prompting, fled from the room. Martha said to herself that "it was all over." At that point, she broke the bonds of fear, the defendants abandoned all attempts to hold her, and no force otherwise confined her. At that point, in other words, she was no longer confined. We also think it apparent that up to that point, the confinement that had occurred was for the purpose solely of rape and robbery, and not of holding Martha to extort the police.

The situation changed again when the police ordered Chavez to freeze, stopping him in his flight. It was then that he declared the intent to hold Martha as a hostage, an intent that was not reasonably manifest before the order to freeze. At that point, in order for Martha to be held as a hostage, it was necessary for the defendants to seize or confine her anew. On the facts before us, this was attempted but not consummated. Had Chavez succeeded in securing Martha in the hallway, she would have been seized anew.[18] Had the threat of his presence in the hallway caused her to remain where she was for any appreciable length of time, she would have been confined anew. Neither event occurred. Martha's immediate response to

---

[18]Our finding that no kidnaping arose in the hallway is supported by the trial court's reasoning. In ruling on the defendants' pretrial motion to dismiss, the court stated: "[F]rom my perception, the seizure of the hair issue is irrelevant in the determination of the issue. I don't think it turns on the seizure or the failure to seize her hair. [¶] In my view, the issue is whether or not she was held prior to the running down the hallway. That's my perception of the issue. [¶] I don't think that the record is sufficient to hold one to answer on the attempt, albeit successful or not, to grab someone's hair. I don't construe that as a 209 violation—would turn on that—on that conduct."

Chavez's threat to seize or confine her as a hostage was to successfully challenge his ability to do so. She was at no time subdued by fear and at no time subdued by force, except previously in the commission of the robbery and rapes.

In short, kidnaping for extortion is not established by the mere intention to hold a victim for extortion, if the victim is never held *for that purpose.* To establish this crime, the would-be kidnaper must have control over his victim when the intent to extort is formed, or gain control subsequently. Due to Martha's courage, and specifically to her immediate and successful resistance to Chavez's attempt to gain control of her as a hostage,[19] she prevented the crime of kidnaping for extortion from taking place.

Even if we were to conclude, however, that Chavez might have confined Martha by virtue of grabbing her hair or simply being in the hallway between Martha and the police, we would still have to reverse this conviction. The reason is that the government presented its case on alternate theories of guilt, at least one of which is legally incorrect.

The alternate theory is that Martha was confined as a hostage not by Chavez, but by Martinez. The prosecutor argued to the jury that, while only Chavez may have formed the intent to take a hostage, *both* defendants confined Martha after that intent arose. In a special instruction prepared by the People, the jury was then told that "if one co-conspirator forms the required intent [for a § 209 kidnaping] while the other co-conspirator is holding or detaining a person, both conspirators are in violation of Penal Code Section 209." Thus the jury was invited to find a kidnaping for extortion on the basis that Chavez formed the intent requisite to the crime, Martinez' presence in the bedroom with Martha constituted the act of confinement requisite to the crime, and Chavez' intent transferred over to Martinez to provide the necessary concurrence of act and intent.

That theory is inapplicable to the facts of this case. It is a basic premise of our criminal law that "with crimes which require both some act or omission and mental fault, no crime is committed unless the mental fault concurs with the act or omission, in the sense that *the mental state actuates the act or omission.*" (LaFave & Scott, Criminal Law (1972) § 34, p. 237; italics added.) Professor Perkins, in a section of his treatise entitled "Concurrence of Mens Rea and Actus Reus," agrees: "One error to be avoided is the false notion that 'concurrence,' as here used, means no more than

---

[19]The trial court was apparently troubled by the idea that Martha's resistance might prove dispositive of the question whether a kidnaping occurred. For all crimes, however, that are proven by an act as opposed to an omission, the victim's resistance which prevents the act from occurring is the factor that prevents the crime from taking place.

mere coincidence, because the actual requirement is that the two elements of crime must be 'brought together' in the sense of a causal relation between the mens rea and the *actus reus*. Stated in other words, the *actus reus* must be attributable to the mens rea, and if this relation is clearly shown it is unimportant that the two were not present at the same time, whereas coexistence is not sufficient if the causal relation is lacking." (Perkins on Criminal Law (2d ed. 1969) § 10, pp. 834-835.)

Here, the necessary causal relationship is lacking. If in fact Martinez can be said to have been confining Martha in the bedroom when Chavez expressed the intent to hold her hostage, that confinement was in no way attributable to Chavez' newfound intent. On the record before us, the only act which Chavez precipitated was Martha's, in running out of the bedroom.

The fact that the defendants were coconspirators does not obviate the requirement of a causal concurrence of fact and intent. Although coconspirators are liable for each other's acts committed in furtherance of their conspiracy (as the jury was instructed), they are not *criminally* liable for acts that do not constitute a crime. In order for the combination of Martinez' act and Chavez' intent to constitute a crime for which either or both could be held liable, the intent would have to bear some causal relationship to the act. In this case, it did not.

"[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468]; accord, *People* v. *Houts* (1978) 86 Cal.App.3d 1012 [150 Cal.Rptr. 589].) The record here raises the distinct possibility that the verdict was based on the erroneous theory of a mere coincidence in time of Martinez' presence in the bedroom with Martha and Chavez' intent to hold her hostage. Because of this possibility alone, the conviction cannot stand.

### III

The property removed from the Goodfellows' dresser formed the basis of two counts of robbery, with Martha and Donald named as the respective victims. Martinez challenges his conviction of the latter robbery on two grounds: (1) the property was not taken from Donald's "person or immediate presence" as required by the robbery statute; and (2) since there was but a single taking of property, there can have been but one robbery. We disagree with both contentions.

■ Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) The question here is whether the taking can be said to have occurred in Donald's "immediate presence," inasmuch as Donald was being held in the living room while the property was taken in the bedroom.

To establish the element of "presence," a victim need not perceive the actual taking as long as he perceives any overt act in the commission of the robbery and is subjected to the requisite force or fear. (*People* v. *Wiley* (1976) 57 Cal.App.3d 149 [129 Cal.Rptr. 13]; *People* v. *Lavender* (1934) 137 Cal.App. 582 [31 P.2d 439].) Otherwise, the thief who ties up the store owner in the anteroom so that he can freely proceed to the inneroffice safe would escape liability for robbery, while the thief who orders the storeowner into the inneroffice with him would not. Such a distinction, aside from being arbitrary, would in time render the robbery statute an anachronism used only to reach the most ignorant and unsophisticated thieves.

Here, the defendants could not have taken the property without contending with Donald. That they did so by subduing him in the living room rather than ordering him into the bedroom did not make him any less a victim of the forcible taking. (*People* v. *Lavender, supra.*) The robbery occurred in his "presence" within the meaning of the statute.

■ Martinez' second contention is answered in *People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908]. There the court stated: "We view the central element of the crime of robbery as the force or fear applied to the individual victim in order to deprive him of his property. Accordingly, if force or fear is applied to two victims in joint possession of property, two convictions of robbery are proper." (*Id.,* at p. 589.) *Ramos* held that a single taking of property can support multiple convictions of robbery. Here, since the taking of the Goodfellows' property was accomplished by means of force upon Donald and fear upon Martha, two convictions were proper.

## IV

■ Martinez contends there is insufficient evidence to support the finding that he was armed with a deadly weapon in the fourth rape. We disagree.

■ "A person is 'armed' with a deadly weapon when he simply carries a weapon or has it available for use in either offense or defense." (*People*

v. *Stiltner* (1982) 132 Cal.App.3d 216, 230 [182 Cal.Rptr. 790]; see also *People* v. *Reaves* (1974) 42 Cal.App.3d 852 [117 Cal.Rptr. 163].)

 The evidence showed that Martinez neither used nor carried a screwdriver while committing the rape. Afterwards, while he was dressing, Martha noticed a screwdriver in the bedclothes toward the foot of the bed. This was the one Chavez had used earlier. Martinez had left his own screwdriver in the living room. Martinez was therefore "armed" in the commission of the fourth rape only if he then had one or the other of these weapons "available for [his] use."

The screwdriver had been taken into the bedroom by Chavez, who left it on the bed when he left the room and Martinez replaced him in raping Mrs. Goodfellow. During Martinez' rapes the screwdriver lay on the bed, somewhere between her knees and feet. After Martinez' rapes were over and he had left the bed, Mrs. Goodfellow covered the screwdriver, which until then had been uncovered, by pulling some bedding over it. If the screwdriver had been visible to Mrs. Goodfellow during the rapes, it was not unreasonable for the jury to conclude that it had also been visible to Martinez and that he had recognized it as being within his reach—i.e., "available" to him in case Mrs. Goodfellow needed further "persuasion" to submit to his assaults.

V

 In the course of the crimes, both defendants held screwdrivers to Donald's body. These acts were the basis of the two counts of assaulting Donald with a deadly weapon.[20] On these counts, the defendants received prison terms in addition and consecutive to that received for robbing Donald. Defendants now contend that under Penal Code section 654, they should not have been convicted of both the robbery and assaults, and that even if multiple conviction was proper, separate punishment was not. We agree in part with the latter contention, but reject the former.

Section 654 provides in pertinent part: "An act . . . which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one, . . ." As the defendants point out, this section prohibits conviction, as well as punishment, of two crimes if one of the crimes is a lesser included offense of the other. (*People* v. *Rocha* (1978) 80

---

[20]We assume, without deciding, that defendants were each properly convicted of two assaults upon Donald rather than one continuous assault. This question was not raised at any stage of the proceedings.

Cal.App.3d 972 [146 Cal.Rptr. 81].) ▮▮▮▮ However, our Supreme Court has recently held that assault with a deadly weapon is not a lesser included offense of robbery with a weapon-use enhancement. (*People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520].) Therefore the convictions of both assault and robbery are proper here.

This is not to say that the separate punishments were necessarily permitted. As noted above, each act for which a defendant is criminally responsible can be punished only once. ▮▮▮▮ Further, where multiple criminal acts are committed, a defendant can be separately punished only for those that are independent violations committed in pursuit of different criminal objectives. (*People* v. *Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63].) Both principles come into play here.

▮▮▮▮ The first principle was violated when the trial court punished each defendant twice for a single act of weapon-use. As to each defendant, the two convictions of assaulting Donald were based on (1) the defendant's own pushing of a screwdriver against Donald's body,[21] and (2) vicarious liability for his codefendant's similar act.[22] As to each defendant, his act in personally assaulting Donald was the same act that formed the basis of the personal weapon-use enhancement in the robbery of Donald. Therefore, to punish each defendant for using a deadly weapon in this robbery, for personally assaulting Donald with a deadly weapon, and for aiding and abetting his codefendant's assault, was to punish for at least one weapon-use too many. Under the literal terms of section 654, Martinez could be punished for a use enhancement in the robbery, or for the count 10 assault, but not for both; Chavez could be punished for the use enhancement in the robbery, or for the count 9 assault, but not for both.

The question remains whether each defendant was subject to separate punishment for the robbery itself and the assault perpetrated by his codefendant. Since these crimes involved more than one act (i.e., an assault plus a taking of property), the second principle discussed above comes into play. ▮▮▮▮ The rule is that when a defendant is responsible for both an assault and robbery, he can be punished for both crimes if the assault was not incident to the robbery and was motivated by a separate criminal objective (*People* v. *Sutton* (1973) 35 Cal.App.3d 264 [110 Cal.Rptr. 635]), but if the assault was committed in order to accomplish the robbery, then the defendant can be punished for only one of the crimes. (*In re Henry* (1966) 65 Cal.2d 330 [54 Cal.Rptr. 633, 420 P.2d 97]; *People* v. *Donohoe* (1962) 200 Cal.App.2d 17 [19 Cal.Rptr. 454].)

---

[21]As shown by the evidence and argued by the prosecutor to the jury, these assaults were charged as count 9 to Chavez and count 10 to Martinez.

[22]These were count 9 as to Martinez and count 10 as to Chavez.

Here, the conviction of conspiracy to rape and rob manifested a jury determination that the defendants had in mind two criminal objectives at the Goodfellow home. We do not know, however, whether the jury or the trial court determined that the defendants had formed the intent to rape, as well as to commit robbery, *at the time* of the assaults charged in counts 9 and 10.[23] Only if the intent to rape was operative at that time could these assaults arguably fall outside the purview of section 654.

Ordinarily, we would defer to the trial court's implied findings in this respect. However this is not an ordinary case. We have already seen that separate punishment was wrongly imposed upon Chavez in count 9 and Martinez in count 10. In the next section of this opinion we note that the trial court wrongly imposed separate punishments for a kidnaping and robbery. Later we hold that the court failed to make an adequate showing to support its imposition of full-term consecutive sentences on still other counts. Under these circumstances, we cannot assume from a silent record that the court made findings of fact that would support separate punishment for the robbery of Donald and the vicarious assaults upon him. We therefore think it most appropriate to remand to the trial court so that it may determine whether separate punishment in this instance is warranted after due consideration of the applicable principles of law.

## VI

Defendants argue that, on the facts of this case, they should not have been punished separately for kidnaping Donald to extort Martha's cooperation in the robberies, for robbing Martha, and for robbing Donald. Although we agree that the imposition of sentences for the first two of these crimes precluded a separate sentence for the third, the error is rendered moot by our reversal of the kidnap conviction.

Similarly mooted is Martinez' contention that he could not be convicted both of kidnaping Donald and of falsely imprisoning him. For guidance of the trial court on remand, however, we note that the false imprisonments of Donald were incident to, at most, two criminal objectives—rape and robbery[24]—and were not independent of these objectives. Therefore, should the court choose to impose sentence for any of the assaults upon Donald on

---

[23]The assaults occurred immediately upon the defendants' entry into the house. The Attorney General tells us "it is fairly clear that appellants did not have a well defined plan at the time . . . they entered the house with the intention of stealing whatever they could find of value inside the residence."

[24]The Attorney General argues that the false imprisonment charged in count 12 may have been incident to a sexual advance upon Donald. The facts do not support this interpretation. The conviction in count 12 was based upon the same conduct that constituted the count 10 assault. No sexual advance was made at that time.

the grounds that they were committed to facilitate Martha's rape, and also impose sentence for the robbery of Donald, then notwithstanding the reversal of the kidnaping conviction, no sentence for false imprisonment may be imposed.

### VII

In *People* v. *Belmontes* (1983) 34 Cal.3d 335, 347 [193 Cal.Rptr. 882, 667 P.2d 686], the Supreme Court stated that a decision to impose full-term consecutive sentences for sex offenses under section 667.6, subdivision (c), in lieu of sentencing under section 1170.1, is a "sentence choice which requires a statement of reasons separate from those justifying the decision merely to sentence consecutively." *Belmontes* overruled *People* v. *Ottombrino* (1982) 127 Cal.App.3d 574 [179 Cal.Rptr. 676] insofar as *Ottombrino* had held that sentencing under section 1170.1 is not permitted for those sex offenses listed in section 667.6, subdivision (c).

The sentencing hearing in this case took place after *Ottombrino* and before *Belmontes.* As is pointed out to us in a letter brief, the trial court sentenced the defendants in the rape counts under section 667.6, subdivision (c) without manifesting its awareness of the option to sentence under section 1170.1, and without stating any reasons therefor. We also note several dual uses of fact in the statement of reasons the court did give for its sentence choices. Therefore, we remand the case for resentencing on the rape convictions in conformity with *Belmontes.*

### DISPOSITION

The judgments of conviction on counts II and III are reversed. In all other respects the judgments of conviction are affirmed. The matter is remanded to the trial court for resentencing in accordance with the views expressed herein.

Amerian, J., concurred.

**SAETA, J.**\*—I concur and dissent.

I agree with the majority in all parts of the opinion except for part II, which relates to the kidnaping of Mrs. Goodfellow. I would affirm the convictions for her kidnaping based on my view of the totality of the circumstances facing her. She had been confined, assaulted and raped for a considerable period of time. Until the perpetrators had left the house, or she

---

*Assigned by the Chairperson of the Judicial Council.

had escaped from the house or to the safety of the policemen or her husband, her confinement had not ended. It does not seem realistic to me to divide her confinement as a victim of rape and robbery from her confinement as a hostage under the sequence of events present in this case. While the motives of the defendants may have changed after the rapes, Mrs. Goodfellow's confinement did not, and thus, under either theory advanced by the majority, she was held as a hostage.

Respondent's petition for a hearing by the Supreme Court was denied February 29, 1984.